**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**James Edward WALLING, Defendant-Appellant.**

**No. 72–2834.**

United States Court of Appeals,
Ninth Circuit.

Sept. 17, 1973.

Charles R. Khoury, Jr., Cal. (argued), Michael McCabe, La Jolla, for defendant-appellant.

Donald F. Shanahan, Asst. U. S. Atty. (argued), Harry D. Steward, U. S. Atty., Stephen G. Nelson, Asst. U. S. Atty., San Diego, Cal., for plaintiff-appellee.

Before DUNIWAY and TRASK, Circuit Judges, and LUCAS,* District Judge.

LUCAS, District Judge:

Walling was indicted along with Patricia Schell and Michael Smith for violation of the Dyer Act, 18 U.S.C. § 2312. Walling and Smith pled guilty to the Dyer Act offense, Schell pled guilty to a less serious offense. Subsequently, Walling was granted the right to withdraw his guilty plea, and to change counsel. The Government reindicted him, including an additional count of conspiracy. In deference to counsel's request for additional time to prepare for the new count, the district court was willing to continue the entire case, but Walling refused to waive his right to a speedy trial. Over Walling's objection to consolidation, the trial as to both counts proceeded. Walling was convicted on both counts and sentenced to three years on each count to be served concurrently.

The following is a summary of the facts constituting the case. On or about February 6, 1972, Walling approached the proprietor of a gasoline station in Pampa, Texas, and inquired as to the ownership and availability of a gold and white, late-model Cadillac. The following day, the proprietor discovered that the car was missing, and that some money had been taken from a secret hiding place in a storage room. Apparently only the proprietor, his station attendant, and Walling had known of the money's location. (Walling had been seen around the station on other previous occasions.) Walling had been staying at his uncle's residence in Pampa. The last time he was seen by his uncle was late on the night of February 6, 1972. Schell testified that, on the sixth, Walling had asked her if she wanted to go to California, and had asked Smith if he was ready to go pick up the car. Later, the three loaded the gold and white Cadillac with their personal effects, including a tool box taken from Walling's car, and his car's Virginia license plates. On February 8, 1972, they arrived in El Cajon, California. The following evening, at approximately 11 p. m., the three drove to Wildcat Canyon Road, Walling driving his grandmother's white Cadillac, and Smith driving the gold and white Cadillac.

The two men removed some tires from the gold and white Cadillac's trunk, and siphoned gas from its tank which was then poured over its interior. At about this time, San Diego County Deputy Sheriff Swink was driving up the canyon in his personal vehicle, and noticed the Cadillac stopped in the middle of the

* The Honorable Malcolm M. Lucas, United States District Judge, Central District of California, sitting by designation.

road with its front end pointing toward the edge of the cliff. He noted that its trunk was open, and that some figures were visible. Driving past the first Cadillac, he came upon the white Cadillac with Schell sitting inside. He stopped, and inquired if anything was happening, to which Schell replied, "Not much. We're just out here driving." Continuing on, Swink flagged down a sheriff's patrol unit, and related his observations of the two stopped vehicles. The two deputies in the patrol car then proceeded up the canyon, and passed the white Cadillac traveling in the opposite direction. They turned around, and signalled the white Cadillac to pull over to the shoulder of the road.

Deputy Sheriff Fisher, the officer conducting the stop of the white Cadillac, testified to the following at the pre-trial motion to suppress and at the trial. (Swink was present at the pretrial hearing, and also testified at trial.) At his initial glance into the car, Fisher noticed a large mounted tire placed on the floorboard of the right rear seat, a tool box on the rear seat, and several tools on the floorboard of the driver's seat. Walling was at the wheel of the white Cadillac. He said that he did not have a driver's license when Fisher asked him for identification. Fisher then unsuccessfully sought some form of identification from all three of the occupants. He inquired as to their destination, to which Walling replied that they were returning from his relatives, but he was unable to remember their address. Finally, when questioned over the vehicle's ownership, Walling became visibly nervous and shaken. He stated that it belonged to his father or grandfather, but he was uncertain in this respect. Fisher then asked for proof of the title, and Walling retrieved the registration slip, glanced at it, and then gave it to Fisher. With the exception of the surname, the names of the relatives Walling gave did not correspond to the name on the registration slip. When inquired as to the location of the address of his relatives,

Walling first stated it as being in San Diego, and then he corrected himself referring to it as being in El Cajon. The address given by Walling did not correspond to the one on the registration card.

Fisher then ordered the three to sit in the patrol car while the officers inspected the car's trunk. Fisher found the usual spare tire placed in the wheel well, but also found two unmounted tires, a metal suitcase, another tool box, a green garden hose (which smelled of gasoline), and two Virginia license plates. Fisher then went over to the three occupants, and informed them of their *Miranda* rights. At about this time, Fisher received a radio communication that a vehicle approximately three to four miles away had gone over a cliff embankment, and was on fire. (The burning vehicle was subsequently identified as the gold and white, late-model Cadillac taken from the Pampa, Texas service station. An arson expert from the sheriff's office concluded that the vehicle had been intentionally set on fire with gasoline.)

Deputies Swink and Fisher had been previously aware of a high incidence of criminal activity in the area where the three had been arrested, specifically, cattle poaching, car stripping, and thefts from neighboring residences. It was a lonely, dark and wooded area, infrequently traveled at the hours in question.

At trial, Walling made an offer of proof that Pat Johnson, a fellow inmate of Smith's at the county jail, could testify that Smith had told him that Walling did not know that the Cadillac was stolen until the three arrived in California; that Smith had told Walling he wanted to abandon the Cadillac and that the latter had agreed with the idea that they would notify the police with an anonymous phone call; and that he had also told Walling that the car was stolen for the first time after they arrived in California. The district court refused to allow Johnson to testify when he was

available. Walling's testimony at trial was impeached by the introduction into evidence of two prior convictions in Virginia—grand theft of a tape recorder in May 1970, and attempted auto theft in November 1971.

Walling presented four questions for review by this Court:

(1) whether the stopping of the white Cadillac by Deputy Fisher, based in large measure upon the observations of Deputy Swink, was a lawful temporary detention, and, irrespective of the validity of the stop, whether the subsequent search of the vehicle was proper under the circumstances;

(2) whether the district court erred in not granting Walling a continuance, only ten days prior to trial on the substantive count under the Dyer Act, upon the return of the second indictment with the new conspiracy count;

(3) whether the district court erred in admitting the impeachment evidence pertaining to the two prior State convictions; and

(4) whether the district court erred in precluding an opportunity to present the witness on Walling's behalf by refusing to continue the case so that the witness could be called, once it had reversed its earlier decision to disallow his testimony.

■ With respect to the temporary detention issue, Walling contends at the outset that the district court erred in allowing Fisher, at a pretrial suppression hearing, to testify to the information Swink had communicated to him, instead of requiring Swink to testify directly as to his own observations. This preliminary point is without merit. The purpose of offering Swink's extrajudicial statements through Fisher was not to prove the truth of that which Swink had observed, but to demonstrate those circumstances which served as a foundation for Fisher's own observations and actions immediately prior to and during the detention of the Cadillac. Thus, Fisher was not communicating to the jury the substance of that which was reported to him by Swink. Rather he was merely furnishing the basis in fact for those circumstances (which facts were derived from a highly reliable source, Swink) which resulted in an investigative lead. These relayed facts prompted him and his companion to cruise up Wildcat Canyon Road, and, ultimately, compelled him to pull over the Cadillac for a limited investigatory inquiry into the presence of its occupants at that time and place, and their relationship, if any, to the earlier unusual chain of events observed by Swink. Accordingly, there was no error in allowing him to so testify in this fashion. *See* Davis v. United States, 411 F.2d 1126, 1127–1128 (5th Cir., 1969); United States v. Campbell, 466 F.2d 529, 531 (9th Cir., 1972); cert. denied 409 U.S. 1062, 93 S. Ct. 571, 34 L.Ed.2d 516 (1972); see also Busby v. United States, 296 F.2d 328, 332 (9th Cir., 1961).

■ Walling contends that this Court is bound by the decision in Remers v. Superior Court of Alameda County, 2 Cal.3d 659, 87 Cal.Rptr. 202, 470 P.2d 11, (1970) (en banc) which held that where an arrest by one officer is based upon information furnished by another officer, the State must adequately demonstrate that basis in fact, furnished by the latter officer, which allowed the former to conduct the arrest; otherwise, in theory, manufactured probable cause, fictional and unsubstantiated, could be applied to sustain the propriety of the arrest of any person without an opportunity to test those basic facts upon which the purported probable cause for arrest was based. Even if this State standard were controlling in this Circuit, the factual circumstances and legal implications raised in *Remers* can be distinguished from those in the instant case. First, the deprivation of liberty in *Remers* was an arrest based upon the conducting officer's mere knowledge of distant hearsay of the most general nature, and

unspecific in source, coupled with his own highly subjective interpretations of seemingly innocent street behavior. In contrast, the deprivation of liberty in the instant case was only a reasonably conducted limited investigatory response —a temporary detention—based upon highly reliable information received, directly and immediately, from another specifically identifiable law enforcement officer. Second, the State in *Remers* was totally unable to identify and produce at trial the source of the background knowledge which prompted the arresting officer to confront the petitioner. In contrast, the Government in this case was not only able to identify and produce Swink as the prime source of the information, but Walling had uncompromised opportunities to either call him as a witness at the pretrial motion to suppress, or to subject him to vigorous cross-examination at trial. Swink's testimony at trial certainly cured any procedural deficiencies which might have been latent in the Government's case as of the pretrial suppression hearing, even under *Remers,* particularly in light of the distinguishing characteristics of the two cases in matters of fact and law. *See* discussion, *supra.* Accordingly, there was no prejudice even under the State standard, were it deemed to be authoritative, in allowing Fisher to testify as to those facts supplied by Swink which prompted him to temporarily detain the Cadillac.

■■■■ Thus disposing of the procedural questions raised by the manner of presenting the observations gathered by Swink, the substance of those observations can now be tested to determine the propriety of the detention under State and Federal law. Since the temporary detention of the Cadillac was accomplished by State officers acting under authority of California law, the initial inquiry as to its validity will be under standards of California State law, subject to subsequent application of the appropriate Federal standards. The State standards for testing the validity

of the Cadillac's temporary detention are set forth in People v. Henze, 253 Cal.App.2d 986, 61 Cal.Rptr. 545, 547 (1967). The peace officer must have a "rational suspicion" that "some activity out of the ordinary is or has taken place" which, in some fashion, is connected with the subjects under scrutiny and which, in some manner, suggests that the activity was criminal. The Federal constitutional standards expressed in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) provide an opportunity for an intermediate response and detention of any person by a peace officer if that response and detention was "reasonably prudent" under the circumstances, meeting the test of specific reasonable inferences which the officer is entitled to draw from the facts based upon his own experience. *Terry, supra* 392 U.S. at 27, 88 S.Ct. 1868. Thus defined, the two standards can be applied to the specific circumstances of the temporary detention in this case.

■■■ Some analytic guidelines which may be imposed in a temporary detention situation were set forth by this Court in the pre-*Terry* case of Arnold v. United States, 382 F.2d 4, 7 (9th Cir., 1967). Of those guidelines, three appear to be particularly helpful in discussing this case: (1) the seriousness of the possible offense; (2) the degree of likelihood of the involvement in such offenses by the persons detained; and (3) the nature and extent of the detention itself.

■■■ The overall circumstances of this case indicated the presence of two vehicles on a remote rural road late at night, which vehicles were stopped in the roadway on a curve at the top of a grade; the positioning of one vehicle such that it pointed toward the edge of a cliff embankment, with its lights on and trunk lid open; the presence of a single female in the other vehicle who appeared nervous, yet denied anything unusual was happening; and the combined knowledge of the two deputies

that that remote wooded area had been used in the past for various criminal activity. The inferences reasonably available for the deputies to conclude were that the occupants of the white Cadillac driving down the canyon might have been involved in cattle poaching, car stripping, or alien smuggling (the latter inference in no manner establishes a foundation for treating the stop under the border search doctrine in light of the locale and the total circumstances, *see generally* United States v. Majourau, 474 F.2d 766, 769–770 (9th Cir., 1973).) That some of the factual conclusions were taken from information supplied by Deputy Swink does not preclude its usage by Deputy Fisher to form his own conclusions or its application under the *Terry* standard. Adams v. Williams, 407 U.S. 143, 146–147, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). Based upon the above factual circumstances, this Court cannot conclude that, either under the State or the Federal standard, the temporary detention of the Cadillac for a limited investigatory inquiry was based upon either an unfounded suspicion or was otherwise arbitrary or harassing. Wade v. United States, 457 F.2d 335, 336–337 (9th Cir., 1972); Wilson v. Porter, 361 F.2d 412, 415–416 (9th Cir., 1966); *cf.* United States v. Davis, 459 F.2d 458 (9th Cir., 1972). Accordingly, the stop of the white Cadillac was a lawful temporary detention.

▮▮▮▮ The final aspect of the temporary detention issue as to the impropriety of the subsequent search is also without merit. At trial, Deputy Fisher testified that Walling had given his consent to a search of the Cadillac's trunk. On review, this Court is obligated to make that construction of the evidence presented in a light most favorable to the verdict delivered. United States v. Nelson, 419 F.2d 1237, 1241 (9th Cir., 1969). The temporary detention having been proper, Walling's consent to the search of the car trunk was effective under the circumstances. However, in any event, probable cause lay as to the search of the vehicle. *Cf.* Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (search of vehicle was based wholly on consent with no probable cause present). When Deputy Fisher approached the vehicle, he noticed several objects within plain view, or readily revealed by the illumination of his flashlight. *See* discussion, *supra.* The deployment of a flashlight in this manner is not a search for purposes of determining probable cause. *See* Cotton v. United States, 371 F.2d 385, 393–394 (9th Cir., 1967); *see also* United States v. Capps, 435 F.2d 637, 641 (9th Cir., 1970); rehear. denied (1971). Objects within the plain view of an officer conducting a lawful temporary detention are properly subject to seizure if warranted. United States v. Davis, 423 F.2d 974, 976–977 (5th Cir., 1970); rehear. denied (1970); cert. denied 400 U.S. 836, 91 S.Ct. 74, 27 L.Ed.2d 69 (1970). Probable cause is concerned with probabilities which, in nature, are not technical forms, but are those "factual and practical considerations" upon which reasonable men base their actions, Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); rehear. denied (1949), and is dependent upon those facts and circumstances within an officer's knowledge, based upon "reasonably trustworthy information," which would warrant a reasonably prudent man to conclude that an offense was committed. Beck v. State of Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed. 142 (1964). Coupled with the information gathered from the three suspects and the deputy's own personal knowledge and experience as to the locale's history of criminal activity, *see* discussion, *supra*, the discovery of the objects within the Cadillac sufficiently established probable cause to conduct a further search of the car trunk in order to implement a more thorough investigation of the car itself and the activities of its occupants. Accordingly, the search of the car and the seizure of its contents were constitutionally unobjec-

tionable. The products of the search were properly admissible at trial.

■ The second contention involving the putative error in not granting a continuance to allow trial counsel time to prepare for the additional conspiracy charge is at best tenuous. This count arose out of the same operative facts, involved identical persons, and dealt with the same vehicle under the same circumstances as the substantive count under the Dyer Act. Since the nature of this charge, and the intricacies of its defense were rationally related to the amount of time counsel actually had for trial preparation on the substantive charge, this Court concludes that there was no abuse of discretion in denying a continuance. Joseph v. United States, 321 F.2d 710, 711 (9th Cir., 1963). Walling's contention that the conspiracy count was punitive is utterly without merit. Its frivolity may be measured by the fact that he failed to challenge his conviction on that charge.

Walling's argument on the third question is three-pronged: (1) the Virginia grand larceny conviction as an adult while still a minor was excessive punishment, and is not binding upon a Federal court for mere impeachment purposes; (2) the records of the two Virginia convictions did not sufficiently demonstrate a knowing and intelligent entering of the guilty pleas, thus demonstrating an imperfect waiver of constitutional rights; and (3) the usage of the attempted auto theft conviction was error in that the district court limited its examination of same to the fact of the Virginia record, not inquiring into the waiver of the jury trial.

The introduction into evidence of the Virginia State convictions was for the limited purpose of impeachment of the credibility of the defendant as a witness on his own behalf. There are two schools of thought as to the proper role of the district court in allowing the introduction of such impeachment evidence before the jury. One doctrine teaches that the impeachment evidence is not automatically admissible as a general rule, but that it should be allowed only as a result of the district court's informed discretion after carefully balancing a variety of factors which may vary in an individual case. Luck v. United States, 121 U.S.App.D.C. 151, 348 F.2d 763, 768–769 (1965); rehear. denied (1965); see generally Weaver v. United States, 133 U.S.App.D.C. 66, 408 F.2d 1269, 1274–1276 (1969); rehear. denied (1969); cert. denied 395 U.S. 927, 89 S. Ct. 1785, 23 L.Ed.2d 245 (1969). The opposing doctrine simply follows the general rule that evidence of prior convictions is admissible to impeach the testimony of a witness. There is a division of opinion in this Circuit as to the applicability of the two doctrines,[1] however, the particular resolution by the district court in this case appears to have obviated any necessity for an unequivocal adoption of either of the two doctrines at this juncture. The district court appeared to proceed on the assumption that it possessed the discretionary power to exclude the evidence of Walling's two prior convictions as impeachment evidence. See Allison, supra 414 F.2d at 411. Such an approach is certainly within the district court's broad range of discretion, and such impeachment evidence is admissible in this Circuit under those circumstances, but there is also authority that evidence of prior convictions should be excluded if, in the district court's opinion, a balancing of fac-

1. For a comparative discussion of the lines of decisions, see United States v. Allison, 414 F.2d 407, 411–412 (9th Cir., 1969) nn. 11 and 12; cert. denied 396 U.S. 968, 90 S. Ct. 449, 24 L.Ed.2d 433 (1969); cf. also United States v. Harper, 443 F.2d 911 (9th Cir., 1971); cert. denied 404 U.S. 851, 92 S. Ct. 87, 30 L.Ed.2d 90 (1971) with United States v. Haili, 443 F.2d 1295, 1298–1299 (9th Cir., 1971); United States v. Michaelson, 453 F.2d 1248, 1249 (9th Cir., 1972); and United States v. White, 463 F.2d 18, 20 (9th Cir., 1972); rehear. denied (1972); cert. denied 409 U.S. 1024, 93 S.Ct. 467, 34 L.Ed.2d 316 (1972).

tors disfavors the evidence's probative value in light of its potential prejudicial effect. *Allison, supra* 414 F.2d at 411–412.

In the instant case, the district court appeared to consider not only the relatively recent date of the prior convictions, the very nature of the offenses in question, and the age of the defendant, but most critically, the potential for prejudice inherent in the prior convictions as impeachment matter in relation to its probative value on the crucial issue of his credibility in delivering his account of the acts in question. *See Luck, supra* 348 F.2d at 768. Under these circumstances, therefore, without holding whether an exercise of informed discretion by the district court is mandatory before deciding to admit evidence of prior convictions for impeachment purposes, this Court concludes that the discretion *in fact* exercised by the district court to allow the evidence of the prior Virginia State convictions as impeachment material was not an abuse of authority, rather it was a carefully measured response to several conflicting considerations in this particular case. *See* United States v. Stroud, 474 F.2d 737, 739 (9th Cir., 1973).

The remainder of Walling's collateral attack argument is of no merit. He testified that counsel was present at the Virginia proceedings, and his trial counsel below stipulated as to the record of those two convictions, which, on their face, demonstrated to the district court that he had been duly informed of his constitutional rights. There is no error as to the district court's examination of the two prior Virginia State convictions, and as to its allowance into evidence of those records for impeachment purposes.

Finally Walling contends that the district court erred in not allowing into evidence the extrajudicial state-ments of Smith conveyed to a fellow county inmate, Pat Johnson, to the effect that Walling's complicity in the crime was far less involved, and that Smith was, in some sense, the primary culprit in the case. *See* discussion, *supra.* Thus, the theory under which the hearsay would be admitted would be a declaration against Smith's penal interest. The current law in this Circuit does not recognize the declaration against penal interest exception to the hearsay rule. Scolari v. United States, 406 F.2d 563 (9th Cir., 1969); cert. denied 395 U.S. 981, 89 S.Ct. 2140, 23 L. Ed.2d 769 (1969) adopted the rule expressed in Donnelly v. United States, 228 U.S. 243, 272–277, 33 S.Ct. 449, 57 L.Ed. 820 (1913) which disallowed that exception, and that posture has been reaffirmed recently in United States v. Lopez-Cruz, 470 F.2d 193 (9th Cir., 1972). The proposed Federal rules of evidence provides for the recognition of this exception, see Rule 804(b)(4), Rules of Evidence for United States Courts and Magistrates, but those rules were not to become effective until July 1, 1973, and recent developments suggest that their entering into force will be delayed even longer.[2]

Notwithstanding the position in this Circuit on the penal interest exception, Walling suggests that the recent decision in Chambers v. State of Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L. Ed.2d 297 (1973) requires the invocation of this exception in this particular case. However, that case, on matters of law and fact, can be distinguished from the instant case. First, the Supreme Court expressly noted that its holding was to be limited to the "facts and circumstances" of that case, *Chambers, supra* 410 U.S. at 301, 93 S.Ct. at 1049, and it expressly refrained from deciding "whether, under other circumstances [the exclusion of some declaration

---

2. On March 30, 1973, Congress declared that these rules shall have "no force or effect except to the extent, and with such amend-ments, as they may be expressly approved by Act of Congress." Pub.L.No.93–12, March 30, 1973.

against penal interest statements] might serve some valid state purpose by excluding untrustworthy testimony." *Chambers, supra* 410 U.S. at 300, 93 S. Ct. at 1048. Second, the facts and circumstances of that case are in substantial variance with those in the instant case. The declarant in *Chambers,* McDonald, orally admitted, on three separate occasions to different friends *shortly after* the homicide in question, his direct responsibility for that crime. In contrast, the declarant here, Smith, orally admitted, on only one occasion to a fellow inmate long after the commission of the criminal act and prior to his own sentencing, of certain actions which only served to substantiate his own, already established, culpability, and which only mitigated, *in part,* the complicity of Walling in the offenses charged. Furthermore, McDonald also made a written confession as to his responsibility, and the Supreme Court was disturbed by the additional factor that Chambers was not allowed to examine McDonald as an adverse witness as to his past actions. These elements are noticeably absent in the instant case. Additionally, the Supreme Court noted that McDonald's confessions were corroborated by other evidence in the case (including eyewitness accounts as to his complicity in the shooting); that the confessions were, in a very real sense, self-incriminatory, and unquestionably against interest; that the truthfulness of the extrajudicial

statements *could* have been tested by cross-examination of McDonald who was available in the courtroom (comparing the situation in *Donnelly, supra*); and, finally, that McDonald's testimony was "critical to Chambers' defense." *Chambers, supra* 410 U.S. at 310, 93 S.Ct. at 1049. Analogous factors of equally compelling weight were not present in the instant case, with the possible exception that Smith's declaration *might* have been against his interest to an uncertain degree (however, in any event, the testimony of Schell and Deputy Fisher provided a substantial foundation for demonstrating Walling's complicity in the two offenses charged). Accordingly, this Court concludes that the facts and circumstances of this case are not such as to necessitate a departure from the *Donnelly* doctrine, and to require application of the narrow holding in *Chambers*.[3] The background and development of the hearsay question in Walling's case are not such that the hearsay rule's application raises constitutional issues directly affecting the ascertainment of his guilt. *Cf. Chambers, supra,* 410 U.S. at 299, 93 S.Ct. at 1048–1049. Therefore, the district court did not err in initially precluding Johnson's statements, or in refusing to continue the case until he could appear to testify.

The judgment of conviction as to both the conspiracy and the substantive counts is affirmed.

---

3. Notwithstanding the erosion of the stance taken by this Court in *Scolari,* and the weakened character of *Donnelly* in general, a rejection of the doctrine expressed in the latter case would seem to be a disfavored resolution of the instant case for the following reasons: (1) the very limited and somewhat equivocal nature of *Chambers* on the declaration against penal interest exception to the hearsay rule; (2) the very obvious failure of the Supreme Court in *Chambers* to overrule *Donnelly*; (3) the suspended state of the proposed Federal rules of evidence which provide for the recognition of that exception; and (4) the nature of the instant case being such that the admissibility of the particular declaration against penal interest at issue would not be dispositive to the final outcome on appeal. Specifically,

with respect to this last point, this case can be distinguished from *Chambers* in two particulars: (1) McDonald's confessions were "corroborated by some other evidence;" and (2) the Supreme Court found "persuasive assurances of trustworthiness" in the rejected testimony. 410 U.S. at 299 and 301, 93 S. Ct. at 1048 and 1049. Also, there is a very real question in this case as to the "availability" of Smith, as a declarant against penal interest, since there was at least a remote possibility that he might not consent to testify, as to any of his prior statements, *prior* to his sentencing. In sum then, the particulars of this case do not lend themselves to a ready disposition of the viability of the *Donnelly* doctrine in light of the overall impact of *Chambers*.