**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Carl Martin BRANDENFELS, Defendant-Appellant.**

**No. 74–1003.**

United States Court of Appeals, Ninth Circuit.

June 30, 1975.

Rehearing Denied Aug. 13, 1975.

Certiorari Denied Dec. 15, 1975.

See 96 S.Ct. 564.

Keith L. Kessler, Seattle, Wash. (argued), for defendant-appellant.

Jerald E. Olson, Asst. U. S. Atty., Seattle, Wash. (argued), for plaintiff-appellee.

## OPINION

Before MOORE,[*] DUNIWAY and TRASK, Circuit Judges.

MOORE, Circuit Judge:

Appellant Carl Martin Brandenfels was named in fifteen counts of a twenty count indictment alleging *inter alia,* fraudulent offer and sale of securities,[1] embezzlement of funds from a federally insured savings and loan association,[2] falsely making and counterfeiting instruments issued by a savings and loan association,[3] and conspiracy[4] to perform these and certain other unlawful acts. Also named in the indictment were Kenneth H. Grove and Robert V. Gnapp.[5] Brandenfels was tried alone, Gnapp having pled guilty to one count and become a government witness, and Grove having been unavailable at the time of trial, as hereinafter further discussed.

The trial was fairly lengthy and exceedingly complex. Brandenfels was convicted on the conspiracy count and on seven counts of aiding and abetting coindictee Grove in the embezzlement of approximately $1,500,000 from a federally-insured savings and loan association. Although the evidence introduced at trial was voluminous, the sufficiency thereof is not at issue, and a relatively brief summary will suffice to place in context the rather straight-forward issues presented by this appeal.

Beginning in late 1969, Grove negotiated for the purchase of Northwest Guaranty Savings and Loan Association (Northwest Guaranty), a somewhat fi-

---

[*] Honorable Leonard P. Moore, Senior Circuit Judge, United States Court of Appeals for the Second Circuit, sitting by designation.

1. 15 U.S.C. § 77q(a).

2. 18 U.S.C. § 657.

3. 18 U.S.C. § 493.

4. 18 U.S.C. § 371.

5. Counts XVI–XX of the indictment named only Grove and Gnapp and charged them with forging obligations of a savings and loan association (18 U.S.C. § 493) and interstate transportation of forged securities (18 U.S.C. § 2314).

nancially troubled institution located in Seattle, Washington. Brandenfels, who was in the business of purchasing, rehabilitating, and reselling substandard housing, actively assisted Grove in these negotiations, although he did not himself purchase any interest in Northwest Guaranty.[6] An installment sale was arranged, and in January 1970 Grove became president of Northwest Guaranty. Thereafter, Brandenfels remained actively interested in the affairs of Northwest Guaranty. In July 1970 he paid $300,000, the amount of the installment due from Grove on that date, to the former owner of Northwest Guaranty.[7] From January 1970 to January 1971, Brandenfels also purchased over $6,000,000 in brokered funds from eastern money brokers for deposit in Northwest Guaranty. (Money brokers obtain funds from depositors by paying them a "bonus" for placing money with the broker rather than directly into a savings institution. In return for a fee of about 3% of the deposit, the broker then sells the aggregate funds of many investors to persons for deposit in a lending institution. The institution then issues certificates of deposit directly to the individual investors.) Although the government's evidence showed that a substantial portion of these brokered funds was diverted to the personal use of Brandenfels and co-indictee Gnapp, most of the money was deposited in Northwest Guaranty, thereby dramatically raising the level of total deposits in that institution. Unfortunately for the persons involved with Northwest Guaranty, however, about January 15, 1971, the flow of brokered funds ceased as a result of a Federal Home Loan Bank Board investigation. Regulations limit the amount of bro-

kered funds held in a federally insured savings and loan association to 5% of deposits, and the proportion of brokered funds at Northwest Guaranty substantially exceeded this percentage.

Beginning almost immediately after the inflow of brokered funds terminated and continuing to the end of March 1971, Grove disbursed the approximately $1,500,000 involved in six of the embezzlement counts on which Brandenfels was convicted.[8] Grove made false entries on Northwest Guaranty's books, recording these sums as having been paid to a Kassler & Company of Denver, Colorado, for the purchase of VA and FHA loans. In fact, about $1,100,000 was disbursed directly to Brandenfels or placed in accounts over which Brandenfels either exercised total control or had partial control along with Gnapp. The government introduced evidence showing that this money was used by Brandenfels and Gnapp to make up shortages caused by the prior diversions of brokered funds and to replace the proceeds of Northwest Guaranty loans which had been made to Gnapp and been diverted by him for purposes other than those for which the money was lent. The remaining $400,000 was disbursed to Grove himself.

When in May 1971 Grove received word that Northwest Guaranty had received an inquiry from an investor about a fraudulent certificate of deposit previously issued by Grove but not recorded on the books of the institution, Grove realized that his manipulations at Northwest Guaranty were about to be uncovered. He fled the country, taking with him the $400,000 which he had disbursed to himself.

6. Brandenfels testified that he viewed Grove's association with Northwest Guaranty as advantageous to him (Brandenfels) from several standpoints: as a source of funds for Brandenfels' own business; as a source of financing for Brandenfels' real estate customers; and as a source of information on FHA-subsidized housing programs.

7. The $300,000 was traced to Northwest Guaranty loans made to Gnapp and Wornstaff (an

unindicted co-conspirator). 18 U.S.C. § 1006 makes it unlawful for officers such as Grove to participate directly or indirectly in the proceeds of loans from the institution with which they are associated, and violation of 18 U.S.C. § 1006 was named as one of the objects of the conspiracy charged in the indictment.

8. An additional count (Count XIII) involved $40,000 disbursed on November 30, 1970.

Within a month, Brandenfels learned that Grove was in Brazil. Accompanied by Thomas Murphy, his then attorney, Brandenfels flew to Sao Paolo in June 1971 and interviewed Grove in a park. Among other things, Brandenfels and Murphy asked Grove questions provided by the Federal Home Loan Bank Board and the Securities and Exchange Commission, which were then in the process of investigating the affairs of Northwest Guaranty. In the course of discussions with Murphy and Brandenfels, Grove made a statement purporting to exonerate Brandenfels, Gnapp and others of any complicity in misconduct while Grove was president of Northwest Guaranty. This statement was tape recorded by Murphy.

Grove remained at large in Brazil until December 1972, when he was arrested. Extradition proceedings commenced at that time, but Grove was not returned to this country until mid-October 1973 (Brandenfels' trial had long since terminated, having lasted from June 11, 1973, to July 6, 1973).

Brandenfels testified in his own defense. He did not deny that Grove had in effect stolen $1,500,000 from Northwest Guaranty or that approximately $1,100,000 of this amount had been disbursed to him. However, Brandenfels did deny having any knowledge that the funds had been wrongfully taken from Northwest Guaranty. He testified that Grove had previously told him that he (Grove) had established a $1,000,000 line of credit for Brandenfels through a concern called Western Investors. Brandenfels stated that he had executed various promissory notes, deeds of trust, and mortgages for Grove as security, and had thought that the funds disbursed to him came from this seemingly legitimate line of credit. However, the deeds of trust and similar documents were never recorded by Grove, and Brandenfels testified that he had not retained copies for himself.

Brandenfels raises two points in this appeal. The first relates to the failure of the district court to grant a 90–120 day continuance to allow the return of Grove to this country so that Brandenfels might secure his testimony. The second concerns the refusal of the trial court to admit into evidence the tape recording made in Sao Paolo in which Grove exculpated Brandenfels. We find no error in the rulings of the district court and accordingly affirm the judgment of conviction.

I.

On May 30, 1973, Brandenfels made an oral motion to continue his trial for 90–120 days so that Grove might be called as a witness to corroborate Brandenfels' asserted ignorance of any wrongdoing at Northwest Guaranty. The motion was denied. This motion was renewed on the morning of June 11, 1973, the first day of trial, and again denied.

As the appellant recognizes in his brief, the decision whether to grant a continuance rests in the sound discretion of the trial judge and will not be disturbed on appeal unless there has been an abuse of that discretion. *See, e. g., United States v. Beaty,* 465 F.2d 1376 (9th Cir. 1972); *United States v. Harris,* 436 F.2d 775 (9th Cir. 1970); *McConney v. United States,* 421 F.2d 248 (9th Cir.), *cert. denied,* 400 U.S. 821, 91 S.Ct. 39, 27 L.Ed.2d 49 (1970); *Powell v. United States,* 420 F.2d 799 (9th Cir. 1969). We think that the district court here remained well within proper bounds. The grand jury returned the indictment in this case in October 1972. Trial was originally set for December 1972, but an order of continuance was entered on November 20, 1972, and the case eventually scheduled for trial on June 11, 1973. Grove was placed in custody in December 1972, but by June, approximately six months later, still remained in Brazil. Extradition from that country being a rather uncertain process, there was no indication that proceedings would be completed within the 90–120 day period requested by the defense, although it

was assumed that Grove would eventually be returned to the United States.[9]

In view of the detailed nature of the investigation, the extensive trial preparation required of the government, and the number of witnesses expected to be called, the motion for continuance was made fairly late in the proceedings. Meanwhile the defense, having known of Grove's whereabouts and the potential difficulty in securing his presence at trial, had made no motion to take his deposition although this was a possible course of action under Rule 15 of the Federal Rules of Criminal Procedure. Furthermore, there were no assurances that Grove, even if available, would waive his Fifth Amendment privilege against self-incrimination in order to testify for Brandenfels. And even if it could be assumed that Grove, upon his eventual return would agree to testify, from the standpoint of the trial judge, the proffered testimony consisting of acceptance by Grove of sole blame for misdeeds at Northwest Guaranty must have appeared somewhat suspect in view of Gnapp's plea of guilty on one count of the indictment, albeit a count in which Brandenfels was not charged. In short, under all the circumstances, we think that there was good reason for the district court to deny the motion for a continuance and to go ahead with the trial as scheduled.

### II.

Appellant sought to introduce the tape containing Grove's statements made in the Sao Paolo park under an exception to the hearsay rule allowing admission of statements which are against the declarant's pecuniary and penal interests. This offer, upon the objection of the government, was refused by the district court.

First of all, it should be noted that the tape recorded statement by Grove was only marginally against his interest. Although the conversation with Murphy and Brandenfels may have set forth Grove's dealings in some detail, the recorded statement itself only inferentially inculpated Grove by exonerating Brandenfels, Gnapp and others of complicity in any "questionable transactions" at Northwest Guaranty.[10] However, even if we assume that this recording qualifies as a statement against interests, the district court properly excluded it. This Circuit has not recognized the declaration against penal interest exception to the hearsay rule. *United States v. Harris,* 501 F.2d 1 (9th Cir. 1974); *United States v. Walling,* 486 F.2d 229 (9th Cir. 1973), *cert. denied,* 415 U.S. 923, 94 S.Ct. 1427, 39 L.Ed.2d 479 (1974); *Scolari v. United States,* 406 F.2d 563 (9th Cir. 1969). Insofar as the statement may have been against Grove's pecuniary interest by subjecting him to potential civil liability for funds wrongfully appropriated from Northwest Guaranty, such liability was only a natural accompaniment of any criminal acts involving some form of theft and cannot provide grounds for admission of the statement. See, for example, *United States v. Walling, supra,* which in essence involved the theft and subsequent destruction of an automobile and in which this court affirmed the exclusion of a hearsay statement in which the declarant accepted

---

9. Uncertainty that Grove would be returned within the time period requested in the motion for continuance ultimately proved to be well founded, since Grove was not in fact extradited until mid-October, slightly more than 120 days after the start of trial.

10. The transcript of the tape, appearing at page 96 of the record, insofar as relevant, reads as follows:

I will however, make this statement freely: None of those people that are currently being interrogated by various federal agencies were in any way involved in any of those questionable transactions and I refer specifically to Martin Brandenfels, Robert Gnapp [and others] . . . . Mr. Brandenfels was a mortgage loan customer as was Mr. Gnapp. As far as any of these people having any knowledge about how money was originated, who, in some cases the lenders were, other than NWG, the only person that has knowledge of those facts is me, and I have, to the best of my ability, explained to Tom Murphy how these matters were handled . . . ., within certain limitations.

prime responsibility for the acts in question.

However, appellant's contention runs deeper. He argues that we should accept the "more enlightened" view of the statements against penal interest exception embodied in *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), and the newly enacted Federal Rules of Evidence. As to *Chambers,* this court has previously had occasion to note that the Supreme Court's ruling that certain hearsay statements should have been admitted was limited to the "facts and circumstances" of that case and further that the Supreme Court "expressly refrained from deciding 'whether, under other circumstances [the exclusion of some declaration against penal interest statements] might serve some valid state purpose by excluding untrustworthy testimony.'" *United States v. Walling, supra,* 486 F.2d at 238–39, *quoting Chambers v. Mississippi, supra,* 410 U.S. at 300, 93 S.Ct. 1038. *See also United States v. Harris, supra,* 501 F.2d at 7. And as emphasized in both *Walling* and *Harris,* the circumstances surrounding the confessions sought to be introduced in *Chambers* provided considerable assurance of reliability. They had been made spontaneously shortly after the murder in question had occurred; there was other evidence in the trial corroborating the truth of the confessions; each statement was in a very real sense self-incriminatory and unquestionably against interest; and if there was any question about the truthfulness of the statements, the declarant was in the courtroom and could have been cross-examined by the government. The circumstances in this case stand in marked contrast. They were not spontaneous but rather made 4–6 weeks after Grove had fled to Brazil and spoken directly to one of the men sought to be exculpated. Grove at that time was not in custody or awaiting extradition. It can be inferred that he did not plan to return to this country. Alternatively, even if Grove had already resigned himself to eventual apprehension and prosecution, the case against him was so overwhelming, as evidenced by his flight to Brazil, that he had little to lose by exonerating Brandenfels. And aside from Brandenfels' own testimony, there was no evidence corroborating the contention that Grove alone was to blame. Gnapp testified that he had never heard of Western Investors or a $1,000,000 line of credit obtained by Grove for Brandenfels yet Gnapp and Brandenfels had numerous joint accounts on which both could draw. Similarly, the promissory notes, deeds of trust, and mortgages which Brandenfels assertedly signed to secure the credit were never produced. As a consequence, *Chambers* is clearly distinguishable from this case.

■ Even if we assume *arguendo* that the Federal Rules of Evidence (effective July 1, 1975) should be applied in this appeal, they are no more helpful to Brandenfels than *Chambers.* Rule 804(b)(3) provides the following exception to the hearsay rule:

> *Statement against interest.* A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissable (sic) unless corroborating circumstances clearly indicate the trustworthiness of the statement.

According to the last sentence of this provision, Grove's recorded statement would not be admissible to exculpate Brandenfels unless other circumstances clearly indicated the truth of the statement. As we have previously set out in distinguishing *Chambers,* sufficient indicia of reliability are not present in this case.

For the foregoing reasons, we find that the appellant's objections are without merit, and accordingly the judgment of the district court is affirmed.