**UNITED STATES of America**

**v.**

**Luis A. FLORES and Maria Vasquez, Defendants.**

**No. 78 CR 228.**

United States District Court, E. D. New York.

Dec. 4, 1978.

Edward R. Korman, U. S. Atty., E. D. N. Y., Brooklyn, N. Y. by Francis J. Murray,

Asst. U.S. Atty, Brooklyn, N.Y., for plaintiff.

Kenneth Linn, New York City, for Flores.

David Segal, New York City, for Vasquez.

## MEMORANDUM AND ORDER

### THOMAS C. PLATT, District Judge.

Defendants, both of whom have been indicted for conspiracy to distribute heroin (Count 1) and possession with intent to distribute heroin (Count 2) in violation of 21 U.S.C. §§ 846 and 841(a)(1), have moved for suppression of all physical evidence seized on April 4, 1978, on the grounds that the arresting officers did not have a sufficient basis for an investigative stop of the defendants and did not have probable cause or consent to search the defendants' luggage or probable cause to detain or arrest the defendants.

The facts are as follows:

On April 4, 1978, Special Agent Gerard Whitmore and two fellow agents of the Drug Enforcement Administration ("DEA"), Special Agents Sears and Trustey, were watching arrivals at LaGuardia Airport of flights from Chicago, a known "source" city from which narcotics are brought to New York by airplane. They started their surveillances with the 9:30 a. m. flight and were continuing the same when American Airlines Flight No. 552 arrived at 3:50 p. m. from O'Hare Airport in Chicago at LaGuardia Airport, New York.

Defendants were the last two passengers disembarking from the plane; they came off the ramp conversing together; and they stopped when they reached the juncture of the hallway and the waiting room and separated, the defendant Flores proceeding toward the baggage area and the defendant Vasquez looking back and around, apparently to determine whether anyone might be following them. The defendant Vasquez then followed Flores making at least one and possibly two similar stops and several checks over her shoulder as she proceeded past the security area and down to the baggage area.

On arrival in the latter area, defendant Flores went to the furthermost corner where the baggage first appeared on the carousel and stood approximately ten feet away from the same whereas the defendant Vasquez took up a position alongside the carousel some twenty feet away from Flores. As will be noted hereinafter this fact is of some significance in these proceedings.

In their five minute wait for the luggage to arrive, defendants were observed looking at each other several times and defendant Vasquez was seen looking around at other persons.

When the bags arrived defendant Flores effortlessly removed two brand new unmarked (i. e., no identification other than the baggage check) bags from the carousel, one of which bags had a small metal padlock[1] which secured two zipper parts in a fashion which Special Agent Whitmore had seen on a prior narcotics shipment. Flores then summoned a skycap by the name of David Smith. While the latter testified that he only heard the defendant Flores respond to his destination question with "the Bronx", Special Agent Whitmore overheard said defendant first say "Brooklyn" and thereafter heard the defendant Vasquez correct him with "No, No, the Bronx" and defendant Flores then corrected his response to "the Bronx". The two versions are not necessarily inconsistent and in this case the Court credits both witnesses as well as Mr. Smith's statement that he heard no more which, of course, does not mean that no more was said.

Mr. Smith then proceeded to the taxi stand with Flores close behind or alongside, Vasquez some distance behind and the DEA agents bringing up the rear.

Special Agent Whitmore stopped Messrs. Smith and Flores at the taxi stand for the

---

1. A padlock identical to that found on luggage from other Chicago flights with significant amounts of narcotics on two prior occasions.

questioning indicated below and Special Agents Trustey and Sears stopped Vasquez for the same purpose.

Special Agent Whitmore identified himself and asked Flores whether he spoke English to which he received an affirmative reply. Special Agent Whitmore then asked for his airline ticket and identification to which Flores responded by saying that he did not have an airline ticket and gave him a Puerto Rican drivers license. Special Agent Whitmore then asked Flores whether the two bags were his and Flores did not reply; whereupon Mr. Smith gave Special Agent Whitmore the two baggage claim tickets. In the meanwhile, Mrs. Vasquez had failed to produce any identification but had furnished her name to Special Agents Trustey and Sears, had denied having anything to do with the luggage and said that Flores had her airplane ticket and their boarding passes, all of which facts were relayed by Special Agent Sears to Special Agent Whitmore. The latter then turned to Flores and said you have the tickets and boarding passes in response to which Flores exhibited two consecutively numbered tickets in the name of Mr. and Mrs. Alcaide, both one way from O'Hare, Chicago to LaGuardia, New York, purchased for cash on that day, i. e., April 4th, and two boarding passes with seat numbers 26E and 26F.

Special Agent Whitmore then asked whether the luggage belonged to Flores, to which Flores replied that the bags were his but that he did not know what was in them and that they had been packed by someone in Chicago. He added that the luggage had been delivered to him in a locked condition at O'Hare Airport and he had never looked inside the bags and had been told to deliver the same to a George Hotel in the Metropolitan area.

According to Special Agent Whitmore, Flores' hands were shaking, he appeared very nervous and he was speaking in chopped up phrases.

Special Agent Whitmore told Flores that he had reason to believe that he had narcotics and that he (Whitmore) could go to the Federal court and get a warrant to search the luggage or he (Flores) could give him permission to search the luggage. In response to this Flores said that Whitmore should check it out because that was his job. Special Agent Whitmore then asked if he had the keys to the locked luggage, to which Flores replied "No". Special Agent Whitmore then asked if he would mind stepping inside the terminal to permit him to attempt to open the luggage, whereupon Flores took one bag and Whitmore took the other and they proceeded into the terminal followed by the defendant Vasquez and Special Agents Trustey and Sears.

In the meanwhile, in response to questions posed to her by Special Agents Trustey and Sears, the defendant Vasquez acknowledged that she understood English, that she had just been on American Airlines Flight 552; that she had no identification; that she did not have the tickets but that Flores did; that she had been traveling with Flores; that they had come from Chicago; that he was not her husband, just a friend whom she had met yesterday; that the bags did not belong to her but to Flores, and that she did not know what was in the bags; that she was going to the Bronx and that Flores was not going to the same place as she was; that she was married and had children and that she had been visiting people at a California street address in Chicago and that Flores was going to see a lawyer in New York. When they were all inside the terminal the special agents asked the defendants whether they had keys to the luggage and both of them denied having any keys to the bags, whereupon Special Agent Whitmore went into another office and got a set of master keys and found keys that would fit both bags. At this point Special Agent Whitmore advised the defendants that he did not have the authority to open the bags without their consent and that without such consent he would have to obtain a search warrant from the Federal Court. And, in particular, he advised the defendant Flores that he would have to physically open each bag. To this the defendant Flores responded affirmatively and after Special Agent Whitmore unlocked

each bag the defendant Flores physically opened each bag.

In the first bag the agents discovered a package under a newspaper which had a vinegar smell and which, when Special Agent Whitmore poked a small hole in the same, revealed a brown powdery substance. On seeing the package Flores is reported to have exclaimed "Oh my God, it was a mistake, it's not mine, I did not know what was in the bags".

Again obtaining the defendants' consent prior to opening of the second bag, Special Agent Whitmore unlocked the same and Flores opened it. Special Agent Whitmore found another package in the second bag and advised the defendants that he believed both packages contained heroin; whereupon Special Agent Trustey advised the defendants they were under arrest and read them their *Miranda* warnings. Following a telephone call to the United States Attorneys Office for this District Special Agent Whitmore returned and gave the defendants their *Miranda* warnings a second time.

The defendants were then taken to a government vehicle where the contents of the first package were subjected to a field test which proved positive for heroin.

The government takes the position that there was reasonable suspicion to justify the limited investigative stop and interrogation of the defendants at the taxi stand located immediately outside the American Airlines terminal at LaGuardia Airport. Relying on *Terry v. Ohio,* 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968), the government states that DEA agents "may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest" and (on *Adams v. Williams,* 407 U.S. 143, 145–46, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972)), that "[a] brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." We are called upon to balance the need for such a stop against an individual's interest to be free from such an intrusion. *Terry v. Ohio,* 392 U.S. 1 at 21, 88 S.Ct. 1868 (1968); *United States v. Brignoni-Ponce,* 422 U.S. 873, 881, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). In order to justify the intrusion, according to *Terry* (392 U.S. at 21, 88 S.Ct. at 1880):

"* * * the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."

In *Brignoni-Ponce* the United States Supreme Court gave us the following instructions with respect to investigative stops (422 U.S. at 880–882, 95 S.Ct. at 2580):

"Because of the limited nature of the intrusion, stops of this sort may be justified on facts that do not amount to the probable cause required for an arrest. In *Terry v. Ohio, supra* the Court declined expressly to decide whether facts not amounting to probable cause could justify an 'investigative "seizure"' short of an arrest, 392 U.S., at 19 n. 16, 88 S.Ct. at 1879, but it approved a limited search—a pat-down for weapons—for the protection of an officer investigating suspicious behavior of persons he reasonably believed to be armed and dangerous. The Court approved such a search on facts that did not constitute probable cause to believe the suspects guilty of a crime, requiring only that 'the police officer . . . be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant' a belief that his safety or that of others is in danger. *Id.,* at 21, 88 S.Ct., at 1880; see *id.,* at 27, 88 S.Ct., at 1883.

"We elaborated on *Terry* in *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), holding that a policeman was justified in approaching the respondent to investigate a tip that he was carrying narcotics and a gun.

'The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for prob-

able cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response. . . . A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.' *Id.*, at 145–146, 92 S.Ct., at 1923.

"These cases together establish that in appropriate circumstances the Fourth Amendment allows a properly limited 'search' or 'seizure' on facts that do not constitute probable cause to arrest or to search for contraband or evidence of crime. . . . In this case as well, because of the importance of the governmental interest at stake, the minimal intrusion of a brief stop, and the absence of practical alternatives for policing the border, we hold that when an officer's observations lead him reasonably to suspect that a particular vehicle may contain aliens who are illegally in the country, he may stop the car briefly and investigate the circumstances that provoke suspicion. As in *Terry*, the stop and inquiry must be 'reasonably related in scope to the justification for their initiation.' 392 U.S., at 29, 88 S.Ct. at 1884. The officer may question the driver and passengers about their citizenship and immigration status, and he may ask them to explain suspicious circumstances, but any further detention or search must be based on consent or probable cause."

In *United States v. Oates*, 560 F.2d 45 (2d Cir. 1977), the Court of Appeals for this Circuit summarized the law on the subject at hand as follows (560 F.2d at 58–59, 61):

It is now axiomatic that a law enforcement officer has the power, indeed the obligation,[9] to detain a person temporari-

[9] *See, e. g., Terry v. Ohio, supra*, 392 U.S. at 23, 88 S.Ct. 1868; *United States v. Fields, supra* at 1197–98.

ly for the purpose of interrogating him if the officer reasonably suspects that the detainee has committed or is about to commit a crime. *Terry v. Ohio, supra*, 392 U.S. at 20–23, 88 S.Ct. 1868; *id.* at 34, 88 S.Ct. 1868 (Harlan, *J.*, concurring); *United States v. Magda, supra* (2 Cir.) [547 F.2d 756] at 758; *United States v. Riggs, supra* (4 Cir.) 474 F.2d 699 at 702–03; *United States v. Fields, supra.* (3 Cir.) [458 F.2d 1194] at 1197. To establish the constitutionality of the stop, however, the "officer [must be able to] point to specific and articulable facts which taken together with rational inferences from those facts, reasonably warrant that intrusion." *United States v. Magda, supra* at 758, quoting *Terry v. Ohio, supra*, 392 U.S. at 21, 88 S.Ct. 1868; *see, e. g., United States v. Riggs, supra* at 703. Inasmuch as "[t]he reasonableness of [the officer's] conduct must be determined by balancing the need for the stop against the gravity of the intrusion which the stop entailed," *United States v. Magda, supra* at 758; *accord, Terry v. Ohio, supra*, 392 U.S. at 21, 88 S.Ct. 1868; *United States v. Fields, supra* at 1197, it is readily apparent that the "specific and articulable facts" and the inferences that can be drawn from these facts relate to the need for the stop. "Need," in turn, depends on factors such as the seriousness of the offense and the likelihood of the detainee's involvement in the known or suspected criminal activity. *See United States v. Walling, supra* [(9 Cir.) 486 F.2d 229] at 235. Obviously, if the offense is minor and there is substantial uncertainty that the detainee is involved, only a minimally intrusive stop would be proper. On the other hand, when the police officer knows or suspects that an offense with serious societal consequences is being committed and there is some reasonable possibility that the person he detains is involved, a more substantial detention is justified. Between these two extremes lie the great majority of cases; those in which the offense is minor but there is strong suspicion that the detainee is involved, or those in which the offense is egregious but the suspicion that the prospective detainee is involved amounts to little more than a visceral feeling on the part of the police officer.

We believe that the agents' stop of Oates and Daniels, while it did not rise to the level of an arrest, was enough of an intrusion upon their liberty to require more than a minimal showing of need. A significant portion of that need is supplied by the inherent odiousness and gravity of the offense, the societal costs of which, in terms of ruined and wasted lives, are staggering. We further believe that the need for the stop was supported by the fact that quick and decisive action may be required when suspected large-scale dope peddlers are about to board a jet aircraft [10] with narcotics which, as is

[10] That imminent departure of the suspects from the area is a factor which can be considered in assessing need is illustrated by *United States v. Magda, supra* at 759 and *United States v. Santana,* [(2 Cir.)] *supra* [485 F.2d 365] at 368.

commonly known, are a "readily disposable commodity." *United States v. Lampkin, supra,* [(3 Cir.) 464 F.2d 1093] at 1097. Having said all this, we still must be able to find some "specific and articulable facts" which point logically to a reasonable possibility of the involvement of Oates and Daniels in the narcotics trafficking Agent Hammonds believed he was witnessing. We hold, as did the district court below, that the government agents had available to them and justifiably relied upon such facts when they temporarily detained Oates and Daniels.

.    .    .    .    .

In deciding whether the circumstances which we have described pass the threshold of reasonable suspicion necessary to justify the stop which was made in this case, we should emphasize that these circumstances "are not to be dissected and viewed singly; rather they must be considered as a whole." *United States v. Magda, supra* at 758, quoting *United States v. Hall,* 174 U.S.App.D.C. 13, 525 F.2d 857, 859 (1976), and they "are to be viewed through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." *United States v. Magda, supra* at 758, quoting *United States v. Hall, supra,* 525 F.2d at 859. That it is the police officer's

perspective from which the reasonableness of his suspicion must be gauged has been firmly established by a long line of cases which have either expressly so stated or alluded to the officer's training or experience. *See Terry v. Ohio, supra,* 392 U.S. at 23, 88 S.Ct. 1868; *United States v. Magda, supra* at 758; *United States v. Salter, supra,* [(2 Cir.) 521 F.2d 1326] at 1328; *United States v. Walling, supra* at 235; *United States v. Santana, supra* at 368. Thus, it may well be that some patterns of behavior which may seem innocuous enough to the untrained eye may not appear so innocent to the trained police officer who has witnessed similar scenarios numerous times before. In this case, the principal law enforcement officer, Special Agent Hammonds, was a highly experienced narcotics undercover officer who was thoroughly familiar with the dope peddler's clandestine methods of doing business. We therefore find him to have been particularly capable of comprehending the significance of the activities of Paul Oates and Isaac Daniels on the night of April 26 and the morning of April 27, 1972. As was the Third Circuit in *United States v. Lampkin, supra* at 1096, we are satisfied that to Agent Hammonds' eye "[t]here were far too many interrelated factors to have been the result of pure coincidence." We therefore hold that "[t]he combination of these circumstances sufficed to meet the rather lenient test for a stop which the Supreme Court, reversing [the Second Circuit] applied in *Adams v. Williams.*" *United States v. Santana, supra* at 368.

■ What then are the specific and articulable facts which the government claims justified the DEA agents actions in stopping the defendants in this case and questioning them about their identity and the conduct on their part which they claimed aroused their suspicions. The government says that the basis for the stop is found not in any single fact which is "perhaps innocent in itself" (*Terry,* 393 U.S. at 22, 88 S.Ct. 1868, 1881) but in the following set of facts and circumstances "which

taken together warranted further investigation" (*id.*):

1. The defendants arrived on a flight from Chicago, a known 'source' city for drug couriers who bring heroin into New York.

2. The defendants were the last two passengers to depart from the plane.

3. The defendants departed together, engaged in conversation.

4. The defendants stopped just prior to the corridor, with the defendant Flores then proceeding on and the defendant Vasquez looking about and behind her.

5. The defendant Vasquez proceeded to follow the defendant Flores, keeping about ten yards behind Flores.

6. The defendant Vasquez on several occasions glanced behind her to see if she was being followed, and on at least two occasions stopped entirely to see if she was being followed, and on two occasions she made a 360 degree turn to accomplish this.

7. The defendant Vasquez kept the defendant Flores in her view and glanced about apparently to see if Flores was being followed.

8. The defendant Flores proceeded to the baggage claims area, initially stood away from the luggage carousel, and then moved towards it.

9. The defendant Vasquez remained about ten yards away surveilling the area and on several occasions exchanged glances with the defendant Flores.

10. The defendant Flores picked up two pieces of apparently brand new luggage which lacked identification.

11. The defendant Flores placed the baggage on the ground, told a skycap to place the baggage in a taxicab for Brooklyn, was corrected by the defendant Vasquez that the correct destination was the Bronx, and relayed the Bronx destination instruction to the skycap.

12. The defendant Flores and the skycap proceeded to the taxicab area, with the defendant Vasquez again proceeding behind at a distance of ten to fifteen feet.

To the foregoing the Court would add that although the defendant Vasquez had no baggage, she proceeded to the baggage area, took up a position alongside the carousel some twenty feet away from the defendant Flores and waited for non-existent baggage to arrive and the defendant Flores effortlessly removed two bags from the carousel, one of which bore the familiar—at least to the agents—padlock.

The foregoing conduct, when viewed as a whole, unquestionably gave rise to reasonable suspicions and warranted further investigation by the surveilling agents who were trained officers who had witnessed similar (if not identical) scenarios many times before which resulted in narcotics arrests and convictions.

█ It is evident from the above analysis of the cases that the courts are concerned with the extent of the intrusion in each particular case. It is also clear from the facts in this particular case, however, that the initial intrusion was of a very limited nature seeking only identification of the defendants who had started together, separated, one following the other to determine whether others were following them, waited for non-existent luggage, claimed unmarked luggage, joined each other for the purpose of straightening out their destination and separated again. Thereafter, on receiving false answers with respect to the possession of airline tickets and false identification on such airline tickets when the same were ultimately produced, together with disclaimers of ownership and of knowledge of the contents of the bags, the additional intrusion by the agents was not only warranted but necessary.

While the government does not claim that the search by the DEA agents of the luggage itself was proper in that there was probable cause and that the DEA officers thought it was impracticable to obtain a warrant at the time, the Court notes that at the point when the DEA agents invited the defendants to accompany them back to the American Airlines terminal there was indeed probable cause to believe that contra-

band of some sort was in the luggage. At that time, in addition to all of the foregoing suspicious circumstances, the defendant Flores had initially denied having an airline ticket, had produced the airline tickets with fictitious names after the defendant Vasquez had revealed to the agents that he had the tickets, had refused to answer initial questions with respect to the ownership of the luggage and after the skycap had furnished the DEA agents with the check stubs had admitted ownership but had denied knowledge of the contents thereof.

Under the circumstances the DEA agents were justified in stating to the defendants that the available alternatives were to present the facts to a Magistrate or Judge of this Court and seek a warrant to search the luggage or to obtain permission from the defendants to search the same. Moreover, in the case at bar, the DEA agents properly indicated to the defendant Flores that without his consent they did not have the authority without a warrant to search the luggage. In holding that in a normal consent search it was unnecessary to show that the subject of the search knew he had a right to refuse consent, the United States Supreme Court clearly indicated that one way that would go far toward proving the voluntariness of a consent to a search would be to prove that the subject had been advised of his right to refuse consent before eliciting his consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, at 231, 93 S.Ct. 2041, at 2049, 36 L.Ed.2d 854 (1973). That is precisely what the uncontradicted proof shows happened in the case at bar. There is no doubt in the Court's mind, considering "all the circumstances" that the defendant Flores' consent in this case was an informed and voluntary consent. There was no duress or coercion, express or implied; there was no overbearing conduct or threats of any kind on the part of the DEA agents and the defendant Flores physically opened the suitcases for the agents for their inspection.

Finally, the Court of Appeals for this Circuit has not only held that *Miranda* warnings are not a prerequisite to a valid consent to search *United States v. Faruolo*, 506 F.2d 490 (2d Cir. 1974), but also has made the following pertinent comments relating to the consent to the question set forth above (506 F.2d at 494-495):

In *United States v. Bracer*, 342 F.2d 522 (2d Cir.), cert. denied, 382 U.S. 954, 86 S.Ct. 427, 15 L.Ed.2d 359 (1965), the defendant was arrested while in possession of drugs but he did not consent to a search of his residence until he was advised that a warrant would be obtained. Judge Smith's opinion, in which he noted that a finding of voluntariness by a district court should not be lightly overturned by an appellate court, emphasized that "the consent was with knowledge that the agents could and would obtain a warrant." Id. at 525. More recently, this Court affirmed "upon the well considered opinion" of the district court, *United States v. Kohn*, 495 F.2d 763 ([2d Cir.] 1974) (*per curiam*), the denial of a motion to suppress the fruits of a consent search, 365 F.Supp. 1031 (E.D.N.Y.1973). There, approximately ten minutes after observing the delivery of a suitcase of hashish to the defendant's apartment, agents entered the apartment and placed the defendant under arrest. Upon being asked where the bag was located, the defendant inquired whether the agents had a warrant. They advised that they had a "right" to get one and because of the hour they would "secure" the premises until morning. At that point, the defendant consented to a search of the apartment. Like *Bracer, Kohn* implicitly rejects any suggestion that the agents were employing any impermissibly coercive tactic: "Kohn knew of his right to require a search warrant. He specifically asked whether the agents had a warrant and seemed to fully understand the subsequent conversation about the agents getting one." 365 F.Supp. at 1034.

In our view, in light of these cases, the well founded advice of a law enforcement agent that, absent a consent to search a warrant can be obtained does not constitute coercion. There is an admission by the officer that he has no right to proceed

unless the defendant consents. There was in fact, here, a fair and sensible appraisal of the realities facing the defendant Faruolo. No person, even the most innocent, will welcome with glee and enthusiasm the search of his home by law enforcement agents. However, in view of all the circumstances [9] which we

[9] The district court pointed out that "there is no claim or evidence, that at any time other than the gun incident, that Faruolo was physically coerced, restrained or threatened." Record at 377. With respect to the drawn gun the district court found that it "had no lasting effect." Id. at 387. The court further found that "at no time prior to giving consent to the search, were any statements made by the agents which threatened or could have been viewed as threatening to Faruolo's wife or son," id. at 377, and that he "had no cause to be in apprehension for his own safety or that of his family," id. at 378. Moreover, "[t]he Court [did] not believe that Faruolo was 'scared,' and [found] him to have been no more anxious than any other person placed under arrest while in the act of committing what was charged to be criminal activities." Id. "Faruolo, at the time of his arrest, evidenced a state of mind or [sic] disbelief or shame, rather than fear." Id. at 377.

have detailed, we are persuaded that after realizing the facts, including that he had the right not to consent, Faruolo decided freely and voluntarily to consent to the search.

Since writing the above, the Court of Appeals for this Circuit has decided *United States v. Asbury*, 586 F.2d 973 (2d Cir. 1978), in which it enumerated a number of factors "which may be taken into account in determining the issue of reasonableness" (*id.* at 976) of suspicion in search cases, at least four of which may be said to have been present in the present case prior to the investigative stop by the DEA agents herein, namely: (i) excessive nervousness, (ii) unusual conduct, (iii) an itinerary suggestive of wrongdoing including coming from "a well known narcotics source" city, and (iv) inadequate luggage and after the stop "evasive or contradictory answers."

By reason of all of the foregoing, defendants' motions to suppress must be, and the same hereby are, denied.

SO ORDERED.