UNITED STATES of America, Appellant,

v.

Michael J. BRADSHAW and Vance E. Robinson, Appellee.

No. 74–1778.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 25, 1974.

Decided June 30, 1975.

Rehearing En Banc Granted Sept. 9, 1975.

Judgment of Court En Banc Oct. 16, 1975.

Jeffrey T. Demerath, Asst. U. S. Atty., with whom Earl J. Silbert, U. S. Atty., John A. Terry, James F. Rutherford, and James F. McMullin, Asst. U. S. Attys., were on the brief for appellant.

Theodore J. Christensen, Washington, D. C. (appointed by this Court), for appellee Robinson.

Before BAZELON, Chief Judge, WRIGHT, Circuit Judge, and MERHIGE,* United States District Judge for the Eastern District of Virginia.

Opinion for the Court filed by District Judge MERHIGE.

MERHIGE, District Judge.

The Government appeals from the District Court's order suppressing certain items—guns, money, clothing and other relevant items—seized by the metropolitan police without a warrant from a parked and occupantless car that had allegedly been used by appellee Robinson as the getaway car in a bank robbery. We conclude that the District Court was not clearly erroneous and affirm.

* Sitting by designation pursuant to 28 U.S.C. § 292(d).

## I.

On the 21st of March, 1974, at about 11:15 a. m., a branch of the American Security & Trust Company, a federally insured institution located at 822 East Capitol Street, N.E., Washington, D. C., was robbed by four black males. Moments later a witness, Ms. Eleanor Leary, who was in the process of parking her car near the intersection of 8th and A Streets, observed four black men trotting north on 8th Street in her direction. Two of them got into a two-toned tan luxury automobile (later identified as a Cadillac Eldorado) and departed the scene; one crossed the street and fled in a second vehicle; and the fourth continued his flight on foot. Alerted by the siren from a passing police car, Ms. Leary approached two policemen who had arrived on the scene and told them what she had seen. The police in turn relayed her information to the police communications office via their squad car radio. The officers next escorted Ms. Leary to the bank premises where she talked with several investigating detectives and then took her home.

At approximately 11:25 a. m., officers Schlueter and Perkins, who were on routine patrol at the intersection of 6th and K Streets, N. E., received a flash message over their squad car radio directing them to be on the lookout for a "tan luxury auto occupied by two Negro males, last seen heading north on 8th Street, N.E." The officers were told that the car was wanted in connection with a possible bank robbery. Almost simultaneously, the officers saw Robinson's tan Eldorado Cadillac pass in the opposite lane heading north. The officers turned their marked squad car around and followed the Eldorado to 7th and Orleans Streets where it pulled over to the left curb of the street and came to a halt. It was raining very hard that day and the two suspects remained in the Eldorado for a few moments before alighting. Robinson, the driver, got out, looked over at the officers, smiled at them and then reached into the back seat to get a coat which he put on. Rob-inson and the passenger, who had no coat, then began walking south toward Morton Place, N.E., where they met a third person. Robinson and this third person walked into a house at 1111 7th Street, while the passenger continued walking down Morton Place.

After the two suspects had departed, Officers Schlueter and Perkins drove around the block and came up behind the Eldorado where they noticed a cable wire hanging from the trunk, which they took to be indicative of the trunk having been closed in a hurry, so they decided to take a closer look. When they looked through a window of the Eldorado, they saw a bundle of clothing with a blue coat on top beneath the passenger seat. At some point they tried to open the doors of the Eldorado but found that they were locked. Thinking it odd that the passenger had walked out into a heavy rain without putting on a coat, they called for assistance, and parked in a nearby alley where they could keep the car in sight.

Within fifteen minutes, a Detective Fontana and several others arrived at the location of the vehicle. Detective Fontana testified that when he arrived there were "about ten" police officers in the vicinity of the car. (Tr. 14). Meanwhile, a Detective Kaclik and an F.B.I. agent picked up Ms. Leary at her home and drove her to Orleans Place where she positively identified the Eldorado as one she had seen earlier. This identification was made approximately forty-five to fifty-five minutes after the robbery. (*Compare* Tr. 18 *with* Tr. 107). Officer Fontana then called a Mobile Crime Lab for assistance in opening the vehicle. After the arrival of the Mobile Crime Lab, Detective Fontana did not call on the crime lab technician to open the doors of the vehicle, but enlisted instead the aid of a young passer-by and paid him a dollar to reach through a partially open window of the car and lift the lock. With the car unlocked,[1] Officer Alford of the Mobile Crime Lab conducted a search of the passenger section and found money and a revolver beneath

1. The Eldorado was unlocked fifteen minutes after Ms. Leary's positive identification. (Tr. 22).

the front seat. The car was then taken to the Fifth District headquarters where the police opened the trunk and found a carbine, money and a large purse-type bag similar to one carried by the bank robbers. During his search of the car, Officer Alford discovered a registered letter bearing Robinson's name and a nearby address. Police officers went immediately to this address but found the apartment empty.

In an eight count indictment filed May 2, 1974, Robinson and a co-defendant were charged with armed bank robbery, bank robbery, armed robbery, robbery, assault with a dangerous weapon, and Robinson was additionally charged with two counts of carrying a dangerous weapon. Subsequently, on May 17, 1974, Robinson filed a motion to suppress the fruits of the automobile search.

On the basis of the facts just recounted, the District Court, after hearings held on June 21 and 24, 1974, granted Robinson's motion to suppress the evidence. While finding probable cause to search, it nevertheless held the Government had failed to prove sufficient exigency to justify the failure of the police to obtain a search warrant and suppressed the fruits of the automobile search.

## II.

■ We start from the premise that law enforcement officers in order to obtain legal validation of their efforts must still comply with the requirements of the Fourth Amendment when conducting a search of an automobile. While the Supreme Court has permitted a relaxation of certain Fourth Amendment standards in the context of automobile searches and seizures, see Cardwell v. Lewis, 417 U.S. 583, 589–90, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974), the probable cause, neutral magistrate and warrant requirements still have force in the context of such a search. There is no case which establishes the proposition that law enforcement officers in "every conceivable circumstance" may dispense with the warrant requirement in the context of an automobile search. Chambers v. Maroney, 399 U.S. 42, 50, 90 S.Ct.

1975, 26 L.Ed.2d 419 (1970). "The word 'automobile' is not a talisman in whose presence the Fourth Amendment fades away and disappears." Coolidge v. New Hampshire, 403 U.S. 443, 461–62, 91 S.Ct. 2022, 2035, 29 L.Ed.2d 564 (1971). Indeed, the Government concedes as much. Appellant's Brief at 9.

■ Nevertheless, the Fourth Amendment requirements have been relaxed somewhat in the specific situation where the police have probable cause to search a stopped automobile and circumstances make securing a warrant impracticable. The Court has endorsed this more permissive approach on two grounds. First, the cases delineate an "exigent circumstances" exception to the warrant requirement founded upon judicial awareness of an automobile's mobility and the often "fleeting" opportunity to conduct a search once probable cause has been obtained. Carroll v. United States, 267 U.S. 132, 153, 45 S.Ct. 280, 69 L.Ed. 543 (1925); Dyke v. Taylor Implement Co., 391 U.S. 216, 221, 88 S.Ct. 1472, 20 L.Ed.2d 538 (1968); Chambers v. Maroney, 399 U.S. 42, 51, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). This Court has also recognized that it would often be unduly burdensome and unreasonably restrictive to require the police to post a guard and repair to the courthouse for a warrant once they have probable cause to search. United States v. Free, 141 U.S.App.D.C. 198, 437 F.2d 631, 635 (1970). Hence, when obtainment of a warrant would unreasonably impair police efficiency by precluding the seizing of the "fleeting instant" or else unreasonably burden effective law enforcement by requiring the expenditure of valuable resources in immobilizing and watching a vehicle, the Fourth Amendment countenances an exception to the warrant requirement. Second, a different standard for automobiles has also been rationalized on the ground that individuals have a lessened expectation of privacy when traveling in autos—a car travels in plain view on public thoroughfares and "has little capability for escaping public scrutiny"—so that the search of an auto is far less intrusive than a search of a person or

home. Cardwell v. Lewis, 417 U.S. 583, 590–91, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974) (Plurality opinion); United States v. Free, *supra,* at 635.

■ Fourth Amendment considerations may also vary depending upon whether the car is occupied or unoccupied. In general the "exigency" exception has most often been associated with an occupied car stopped on a highway. See United States v. Free, *supra.* In Chambers v. Maroney, *supra,* the Court said:

> [Carroll v. United States] holds a search warrant unnecessary where there is probable cause to search an automobile stopped on the highway; the car is movable, the occupants are alerted, and the car's contents may never be found again if a warrant must be obtained. Hence an immediate search is constitutionally permissible. 399 U.S. at 51, 90 S.Ct. at 1981.

The rule of reason embodied in the Fourth Amendment, then, is flexible enough to permit a police officer with probable cause to search an occupied automobile when the prospect of mobility and the burden on resources occasioned by immobilizing the automobile and posting a guard to watch it create an emergency circumstance or aggravate an already existing emergency.

■ By contrast, the threat of mobility and the burden on law enforcement resources will oftentimes be less acute in the case of an unoccupied automobile which the police have probable cause to search. If there is no intrinsic emergency arising out of the factual situation facing the law enforcement officers, or if the threat of mobility and the prospect of unreasonable burden on resources do not in themselves create an exigency, then even where there is probable cause the Fourth Amendment mandates that the police obtain a warrant before they conduct a search of an unoccupied automobile. *See* Coolidge v. New Hampshire, 403 U.S. 443, 458–64, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (plurality opinion). Mr. Chief Justice Taft in delivering the opinion of the Court in the case which created the so-called "automobile exception," Carroll v. United States, *supra,* recognized as much when he wrote that "[i]n cases where the securing of a warrant is reasonably practicable, it must be used . . ." 267 U.S. at 156, 45 S.Ct. at 286. *See* Coolidge v. New Hampshire, *supra,* 403 U.S. at 461–62, 91 S.Ct. 2022.

We deal today with the warrantless search of the interior of an unoccupied parked vehicle. The cases principally relied upon by the Government, United States v. Free, 141 U.S.App.D.C. 198, 437 F.2d 631 (1970) and Cardwell v. Lewis, 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974), are not controlling. United States v. Free upheld a warrantless search of a stopped vehicle which followed immediately the arrest of the driver where the police had probable cause, based on the victim's identification of the driver as her assailant, to believe that the vehicle contained a weapon which had been used some 45 minutes earlier to perpetrate an armed assault and where prior to the search, the police had neither sufficient information for the issuance of a warrant nor the time to obtain a warrant once probable cause had attached. Cardwell v. Lewis upheld the constitutional validity of a warrantless examination, made upon probable cause, of the *exterior* of a car previously impounded by the police. The evidence thus obtained was ". . . not the product of a 'search' that implicate[d] traditional considerations of the owner's privacy interest." 417 U.S. at 588–89, 94 S.Ct. at 2468. Hence, although Cardwell v. Lewis and United States v. Free provide benchmarks in the exposition of the law of the Fourth Amendment, they do not necessarily dictate the path we must follow today.

### III.

The questions of "exigency" and "practicability" of obtaining a warrant are dependent upon such variables as the mobility of the automobile, the burden upon law enforcement officers, and other facts and circumstances surrounding the warrantless search. In short, the answer to these questions depends upon factual determinations and the consequent appli-

cation of legal categories like "exigency" to the initial findings of fact.

■ The trial court correctly framed the issue in terms of exigency and practicability: did the exigency of the situation render it impracticable for the police to obtain a warrant before searching the automobile? Finding "no showing of exigent circumstances which would make it impracticable for the police to get a warrant prior to searching that car" (Tr. 279), the trial court suppressed the fruits of the search. On review we deal basically with a factual question. The trial court's finding of non-exigency was predicated upon its evaluation of the facts and circumstances surrounding the search. We are not free to set aside the trial court's finding unless the record reveals its view of the facts to be clearly erroneous. Rule 52(a), F.R.Civ.P. Since our review of the record and the briefs does not leave us "with the definite and firm conviction that a mistake has been committed," United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948), we affirm.

■ The trial court found that, although probable cause may have attached, no emergency conditions existed at the time when the two suspects parked the Cadillac at the corner of Orleans and 7th Streets, exited, and proceeded to walk down 7th Street. (Tr. 279). Although officers Schlueter and Perkins followed the Cadillac to 7th and Orleans after receiving the radio message, they made no move to stop the suspects from leaving the area where the car was parked. The Court found that the Cadillac had been immobilized, presumably because the occupants had departed and a substantial force of police officers had arrived. There was no need then to effect an immediate warrantless search on the premise that the automobile might soon be driven from the area when the premise itself no longer comported with reality. Additionally, as the trial Court noted in colloquy with government counsel (Tr. 261), the robbery occurred in the late morning of a business day, and it would not have been

difficult or time consuming to have obtained prior judicial approval before conducting the search. In sum, the Court saw no reason why the police could not have put the automobile under surveillance while they secured the warrant (Tr. 279), reasoning apparently that the police did not lack available manpower for such a task.

The Government contends, however, that the trial court's suppression order was clearly erroneous because it could have found exigent circumstances on any one of several grounds.

First, the Government asserts that the opportunity to search the tan automobile was "fleeting" and that the police therefore were justified in operating on a *carpe diem* principle. It was not "inconceivable," the Government argues, that the bank robbers could have returned and driven the vehicle away, or made a desperate attempt to destroy the incriminating evidence. Alternatively, the vehicle could have been ransacked by vandals or persons acting for the bank robbers while the police were in the process of securing a warrant.

The Court must reject the Government's "fleeting" instant hypothesis. When Detective Fontana arrived at the scene, he found at least 10 police officers surrounding the car. Approximately 12 minutes later, a Mobile Crime Lab arrived at the scene. (*Compare* Tr. 18 *with* Tr. 23). The Court believes it indeed inconceivable that the two suspects could have wrested the car away from the sizeable force then guarding it. It is even more unlikely that they would have returned to attack the police officers in an attempt, which could only be described as foolhardy, to destroy the evidence. Finally, the Government's suggestion that the warrantless search was necessary to prevent the car from being ransacked by vandals or persons acting for the defendants must be characterized as fanciful in light of the number of law enforcement officers present in the immediate area.

Second, the Government raises the drain on resources argument: it contends that the exigency of the situation

precluded the placing of a special detachment around the car because available police manpower was needed to search for the suspects and, consequently, the immediate search was necessary to preserve any evidence which might be in the auto. This argument has plausibility and would indeed support a warrantless search in the appropriate circumstances,[2] but there is absolutely no foundation for it in this record. Our reading of the record reveals that there were never less than three officers surrounding the car and at one period of time there were more than ten officers in the area.[3]

Third, the Government contends that a security detail would only prolong the period of time in which the police would be exposed to danger should the robbers attempt to recover their automobile. Again, this might provide a plausible rationale for a warrantless search in appropriate circumstances. There is, however, absolutely no evidence in the record that the police detail which first surrounded the Eldorado, then searched, and then examined the fruits of the search, was at any time exposed to danger, or that they ever thought themselves exposed to danger.

The Government in its brief misconstrues the functions of a reviewing Court. Our task is not to think of hypothetical situations which could conceivably justify the search in question, but to ascertain whether the trial court was clearly wrong in its view of the relevant facts.

Our review of the record does not leave us with the definite and firm conviction that factual error has been committed. In conclusion we summarize the following facts and inferences supportive of the trial court's determination that no emergency existed and that the police could have moved expeditiously to have obtained a warrant had they so desired: (1) The trial court's inference, drawn from their behavior, that Officers Perkins and Schlueter did not think an

emergency existed when they watched the suspects depart the Eldorado; (2) the fact that the number of police in the area appears never to have fallen below three and at one time exceeded ten; (3) the fact that there were at least three squad cars in the area when the witness, Ms. Leary, arrived to identify the Eldorado (*See* Tr. 82); (4) the capability of the police to move expeditiously when they so desired—they transported Ms. Leary to the bank, took her home, later returned to her house and picked her up, and drove her to the location of the Eldorado where she made the positive identification, all in the space of 45 to 55 minutes; (5) the fact that the police waited for 15 minutes after Ms. Leary's positive identification to conduct the search supports the conclusions that no emergency existed and that there was surplus time which could have been used to secure a warrant; (6) the lack of any evidence in the record to support the Government's contentions that the police were in danger and that their available resources would have been unreasonably drained by application for a warrant; and (7) the fact that the robbery occurred on a Thursday morning when the courts were open and judicial officers readily available.

An order of affirmance will issue.

### Order on Suggestion for Rehearing En Banc

Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges.

### ORDER

PER CURIAM.

On consideration of appellant's petition for rehearing and suggestion for rehearing *en banc*, it is

Ordered by the Court *en banc* that appellant's aforesaid suggestion for rehearing *en banc* is granted, and it is

Further ordered by the Court *en banc, sua sponte,* that the opinion

---

2. See United States v. Free, *supra,* at 635.

3. *Compare* Tr. 14 [*and*] Tr. 19 *with* Tr. 42. Even when approximately a half dozen officers

had been dispatched to investigate the house which Robinson was seen entering, three officers were left to stake out the car. Tr. 42.

and judgment filed herein on June 30, 1975 are hereby vacated.

## ON REHEARING EN BANC

Before: BAZELON, Chief Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges, sitting *en banc*

## JUDGMENT

PER CURIAM.

This cause came on to be heard by the court sitting *en banc* and was reargued by counsel. On consideration of the foregoing, it is

Ordered and adjudged by this Court that the district judge's ruling on the motion to suppress is hereby reversed by a divided court.

Opinions will follow at a later date.