UNITED STATES of America, Appellant,

v.

**Vincent Anthony MAGDA,
Defendant-Appellee.**

**No. 238, Docket 76–1298.**

United States Court of Appeals,
Second Circuit.

Argued Sept. 28, 1976.

Decided Dec. 22, 1976.

Jeremy G. Epstein, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y., Frederick T. Davis, Asst. U. S. Atty., New York City, of counsel), for appellant.

Sheila Ginsberg, New York City (William J. Gallagher, The Legal Aid Society, Federal Defender Services Unit, New York City, of counsel), for defendant-appellee.

Before WATERMAN and VAN GRAA-FEILAND, Circuit Judges, and MOTLEY, District Judge.*

VAN GRAAFEILAND, Circuit Judge:

In an indictment filed in the Southern District of New York on September 24, 1975, Vincent Magda was charged with bank robbery and with assault committed during the course of the robbery. Thereafter, District Judge Robert L. Carter granted defendant's pretrial motion to suppress evidence obtained as a result of an allegedly unlawful seizure of his person. *United States v. Magda*, 409 F.Supp. 734 (S.D.N.Y.1976). In a subsequent order, Judge Carter denied in part a motion of the United States for modification of the scope of the evidence suppressed. The United States has appealed from both orders.

On September 5, 1975, New York City Policeman Saverio Alesi was patrolling in uniform on Eighth Avenue between 42d and 45th Streets. At approximately 3:00 P.M. he observed appellee Magda talking with another man on the north side of 43d Street just west of Eighth Avenue. They were about thirty to thirty-five feet from Alesi, who was standing on the southwest corner of the intersection.

As Alesi watched the two men, he saw them exchange something. Although he could not see exactly what had changed hands, he did see that each man gave and received something simultaneously. After the exchange, the unidentified participant looked in the officer's direction. Immediately after doing so, he turned away in a "rapid motion" and proceeded west on 43d Street. Meanwhile, Magda crossed 43d Street at an angle and started down Eighth Avenue toward 42d Street. As he passed, Alesi tapped him on the shoulder and asked him to stop. Magda turned to face Alesi and slowed his pace but continued down Eighth Avenue, walking backwards. The two men proceeded in this fashion for several steps, covering about ten feet before they both stopped.

Alesi inquired about what had taken place on 43d Street, and at first Magda said that nothing had happened. When asked a second time, Magda replied, "All right. I bought a marijuana cigarette for a dollar", and produced the cigarette from his inside coat pocket. Alesi placed him under arrest and walked him back to 43d Street in a vain attempt to find the other man. Alesi then searched Magda and, upon discovering an unloaded handgun and a robbery demand note,[1] took him to the police station and booked him on gun and drug charges.[2] Subsequent investigation by the FBI linked the note with a robbery at the United Mutual Savings Bank in New York City and resulted in the instant indictment.

Judge Carter held that, if the police officer's stopping of Magda was lawful, the arrest and search which followed the production of the marijuana were also lawful. With this, we agree. *See United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976); *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). Relying largely on New York law,

---

* Of the Southern District of New York, sitting by designation.

1. The demand note read as follows:
 THIS IS A ROBBERY. KEEP YOUR HANDS WHERE I CAN SEE THEM AT ALL TIMES. THERE IS [SIC] TWO OF US SO DO AS YOU ARE TOLD AND NO ONE GETS HURT. PUT ALL YOUR 50's AND 100's INTO THE ENVELOPE AND HAND IT BACK.

2. Magda was charged with state offenses related to his possession of the weapon and the marijuana cigarette. Basing his decision on a review of the applicable state law, Judge Alfred H. Kleiman of the Criminal Court of the City of New York, granted Magda's motion to suppress the gun and cigarette. The state prosecution was subsequently discontinued.

As the court below properly held, Judge Kleiman's decision has no collateral estoppel effect on the United States here. *United States v. Panebianco*, 543 F.2d 447 (2d Cir. 1976). Moreover, in a federal prosecution, it is federal law, not state law, which determines whether a search or seizure conducted by state police officers was reasonable. *Elkins v. United States*, 364 U.S. 206, 223–24, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960); *see United States v. Burke*, 517 F.2d 377, 382 (2d Cir. 1975).

he concluded, however, that the original stop constituted an unreasonable seizure of defendant's person. With this, we disagree.

■ The reasonableness of Alesi's conduct must be determined by balancing the need for the stop against the gravity of the intrusion which the stop entailed. *See Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The *Terry* Court found that the governmental interest in crime prevention and detection would permit a police officer in appropriate circumstances to "approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." *Id.* at 22, 88 S.Ct. at 1880. This principle was reaffirmed by the Court in *Adams v. Williams*, 407 U.S. 143, 145–46, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). Relying on *Terry* and *Adams*, the Supreme Court held explicitly in *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) that probable cause was not required to justify a brief investigative stop of a car suspected of transporting illegal aliens. The Court said that a reasonable suspicion that the vehicle contained illegal aliens would support this "minimal intrusion". *Id.* at 881, 95 S.Ct. 2574. The Second Circuit has interpreted the above cases as authorizing brief investigative stops, of the type at issue here, based on reasonable suspicion. *See Ojeda-Vinales v. Immigration and Naturalization Service*, 523 F.2d 286 (2d Cir. 1975); *United States v. Salter*, 521 F.2d 1326 (2d Cir. 1975); *United States v. Santana*, 485 F.2d 365 (2d Cir. 1973), *cert. denied*, 415 U.S. 931, 94 S.Ct. 1444, 39 L.Ed.2d 490 (1974); *United States v. Riggs*, 474 F.2d 699 (2d Cir.), *cert. denied*, 414 U.S. 820, 94 S.Ct. 115, 38 L.Ed.2d 53 (1973).

■ In applying this test, an investigative stop will be found constitutionally permissible if "the police officer [can] point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio, supra*, 392 U.S. at 21, 88 S.Ct. at 1880. *See United States v. Brignoni-Ponce, supra*, 422 U.S. at 884, 95 S.Ct. 2574. Under the circumstances present here, Alesi's stop of Magda was reasonable.

We view as wise the admonition of the District of Columbia Circuit that "the circumstances before [the officer] are not to be dissected and viewed singly; rather they must be considered as a whole." *United States v. Hall*, 525 F.2d 857, 859 (D.C.Cir. 1976). Alesi knew that the area where he first observed Magda had a high incidence of narcotics dealing. A map in his precinct house designated 43d Street between Eighth and Ninth Avenue as a "narcotics prone location". McCaffrey Park, which is approximately 100 to 125 feet west of where the exchange took place, is particularly notorious as a center for drug traffic. Alesi testified that the park was under 24-hour surveillance. The reputation of an area for criminal activity is an articulable fact upon which a police officer may legitimately rely. *See United States v. Brignoni-Ponce, supra*, 422 U.S. at 884–85, 95 S.Ct. 2574. *United States v. Hall, supra*, 525 F.2d at 859.

Judge Carter found that Alesi had no "extraordinary skill" with regard to street arrests for narcotics. We are not prepared to hold, however, that "extraordinary skill" is the *sine qua non* of every constitutional police inquiry. Alesi had eleven years of experience as a policeman. He had been a foot patrolman for three and a half years and had made street arrests for narcotics before. Although he had made no prior narcotics arrests at the intersection in question during the six months he had been patrolling the Eighth Avenue area, he had seen other officers do so. The circumstances before Alesi "are to be viewed through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training", *United States v. Hall, supra*, 525 F.2d at 859; *cf. United States v. Wabnik*, 444 F.2d 203, 205 (2d Cir.), *cert. denied*, 404 U.S. 851, 92 S.Ct. 88, 30 L.Ed.2d 91 (1971); and eleven years of police experience are not to be lightly brushed aside.

Alesi observed Magda and another man exchange something. After the exchange,

Magda's companion looked in Alesi's direction, turned in a rapid motion and immediately walked away. Considering the locality, these observations were sufficient to raise a reasonable suspicion in a police officer of Alesi's experience. Following Magda for the purpose of surveillance was an unsatisfactory alternative to briefly stopping him because Magda's companion was leaving the scene in the opposite direction. *See United States v. Santana, supra,* 485 F.2d at 368. This is exactly the type of situation which the "rather lenient" *id.* standard enunciated in *Adams v. Williams, supra,* was designed to accommodate.

> The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response. A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time. (Citation omitted).

*Adams v. Williams, supra,* 407 U.S. at 145–46, 92 S.Ct. at 1923.

 A final factor in determining the reasonableness of Alesi's conduct is the nature of the stop itself. "[T]he scope of the particular intrusion, in light of all the exigencies of the case, [is] a central element in the analysis of reasonableness. *Terry v. Ohio, supra,* 392 U.S. at 18 n.15, 88 S.Ct. at 1878. The findings made by the court below show that Alesi did not attempt to harass or intimidate Magda. He did not physically restrain Magda nor humiliate him in any way; he simply asked him to stop. When Magda did so, Alesi asked him what had transpired between him and the other man. When asked a second time,

Magda voluntarily told Alesi about the marijuana cigarette which he then produced. This encounter was but a minor intrusion upon Magda's personal security; it was reasonably related to the observations which had caused Alesi to become suspicious, and it did not exceed the extent of inquiry reasonably justified by those suspicions. It violated none of Magda's constitutional rights.

The orders appealed from are reversed, and the case is remanded to the district court for further proceedings consistent herewith.[3]

MOTLEY, District Judge (dissenting):

In reversing the District Court's order granting the defendant's motion to suppress, the majority today concludes that a police officer can make an investigatory stop based on a combination of entirely innocent factors. Since the majority decision sets a new minimum standard for the "reasonable suspicion" necessary to justify such a stop, I respectfully dissent.

The Government does not dispute the fact that this so-called "investigative stop" was protected by the Fourth Amendment which bars unreasonable searches and seizures.[1] In circumstances such as these, where a person is stopped by a police officer and is apparently not free to ignore the command to stop, there has been a "seizure" under the Fourth Amendment. *Terry v. Ohio,* 392 U.S. 1, 19, n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *United States v. Nicholas,* 448 F.2d 622, 624 (8th Cir. 1971). The question which remains is the narrow one: whether the facts in this instance are enough to create a "reasonable suspicion" in the officer's mind that a crime was, is being, or is about to be committed; has the presumption against warrantless searches and seizures been overcome?

Magda was charged with state crimes relating to the gun and the marijuana cigarette. In connection with the state prosecu-

---

3. Because of the disposition we have reached, it is unnecessary to consider the arguments of the parties which relate to the "fruit of the poisonous tree" doctrine.

1. Government's Brief at 10 [hereinafter "GB ___"]; *See,* 409 F.Supp. at 738.

tion, a suppression hearing was held in Criminal Court of the City of New York before Judge Alfred H. Kleiman on November 14, 1975. Judge Kleiman ruled that, under controlling New York standards, the evidence uncovered in Alesi's search should be suppressed. That prosecution was subsequently discontinued.

Although I agree with the conclusions reached by Judge Carter's opinion below, I must disagree that the District Judge had a choice as to whether to apply New York standards or federal standards to Officer Alesi's conduct. Judge Carter first concluded that the governing standard should be that of the Court of Appeals of New York as enunciated in *People v. Cantor*, 36 N.Y.2d 106, 365 N.Y.S.2d 509, 324 N.E.2d 872 (1975).[2] He then held that applicable federal standards would lead to the same result. However, the Supreme Court has said:

> In determining whether there has been an unreasonable search and seizure by state officers, a federal court must make an independent inquiry, whether or not there has been such an inquiry by a state court, and irrespective of how any such inquiry may have turned out. The test is one of federal law, neither enlarged by what one state court may have countenanced, nor diminished by what another may have colorably suppressed. *Elkins v. United States*, 364 U.S. 206, 224 [80 S.Ct. 1437, 1447, 4 L.Ed.2d 1669] (1960). *Accord, U. S. v. Burke*, 517 F.2d 377, 382 (2d Cir. 1975); *U. S. v. Dudek*, 530 F.2d 684 (6th Cir. 1976).

In *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court first considered the question whether something less than "probable cause" could justify a stop and frisk by a police officer. The Court decided that, although a simple stop for questioning was a "seizure"[3] under the Fourth Amendment, an officer could stop and frisk a person on the street without a search warrant, but clear standards were described to regulate this conduct. The standards there set forth are applicable here. The Court said:

> [I]n determining whether the seizure and search were "unreasonable" our inquiry is a dual one—whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place.[4]

> . . . And in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion . . . And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate?[5]

The Court's standards in *Terry* are flexible enough to cover various degrees of police intrusions, since they require that the actual intrusion be in proportion to the observations which prompted that intrusion. The unique aspect of the decision was that an officer could approach a person for investigative purposes on facts which would not constitute probable cause for an arrest or a search. This showing need be less if the stop is merely for questioning, more if the officer seeks to justify a frisk. The precise contours of the rule were delimited by later cases.

*Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) holds that the *Terry* stop and frisk standard is satisfied not on the basis of personal observations (as in *Terry*) but on the word of an informer. Not until the Supreme Court decided *Unit-*

---

**2.** 409 F.Supp. at 738.

**3.** 392 U.S. at 17, 88 S.Ct. at 1868.

**4.** 392 U.S. at 19–20, 88 S.Ct. at 1879.

**5.** 392 U.S. at 21, 22, 88 S.Ct. at 1880. The Court adds, at 21 n.18, 88 S.Ct. at 1880, that "[t]his demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence."

ed States v. Brignoni-Ponce, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), did it consider the isolated question of what will justify an investigative stop without a frisk. Both *Terry* and *Adams* involved circumstances under which the officer had reason to think his safety endangered. The Court's discussion focused on the propriety of the frisk while tending to obscure the legitimacy of the initial stop.

*Brignoni-Ponce* squarely held that a purely investigative stop of an automobile was not proper simply because three Mexican-looking men were riding in it within a few miles of the Mexican border.[6] Justice Powell's reasoning is particularly applicable to this case.[7] He notes that the number of illegal immigrants in this country is large; that Mexico accounts for an estimated 85% of them; that the national interest in prohibiting the illegal entry of aliens is great; and that it is difficult to apprehend illegal Mexican immigrants since the Mexican border is 2,000 miles long. But against this national interest he weighed the interference with the individual's liberty. Though the intrusion may be modest, Mr. Justice Powell ruled that the Border Patrol Agent must still point to clear and articulable facts which lead him "reasonably to suspect" that the person stopped is engaged in illegal activity. The Court concluded there was no such "reasonable suspicion" in that case since thousands of persons of Mexican descent inhabit the border area, most of whom have no connection with illegal aliens.

The "reasonable suspicion" standard for investigative stops has been adhered to by the courts. *United States v. Mallides*, 473 F.2d 859 (9th Cir. 1973); *United States v. Riggs*, 474 F.2d 699, 707 (2d Cir. 1973), *cert. denied*, 414 U.S. 820, 94 S.Ct. 115, 38 L.Ed.2d 53 (1973); *United States v. Santana*, 485 F.2d 365 (2d Cir. 1973), *cert. denied*,

415 U.S. 931, 94 S.Ct. 1444, 39 L.Ed.2d 490 (1974); *United States v. Salter*, 521 F.2d 1326 (2d Cir. 1975); *Ojeda-Vinales v. Immigration and Naturalization Service*, 523 F.2d 286 (2d Cir. 1975). Of course, the standard is not a precise one, and it can be construed strictly to allow only the most imperative of investigations, or it can be regarded as a green light for police interrogations.[8] The cases that have been decided in this Circuit have interpreted the "reasonable suspicion" test of *Brignoni-Ponce* to require some objective evidence of involvement in crime before an investigative stop will be justified.

Before examining the Second Circuit cases, it would be useful to examine the factors which the Government claims were sufficient to justify Alesi's search of Magda.

In its brief (GB 11) the Government notes five factors which it claims, when taken together, constitute the basis for the "reasonable" suspicion needed for the investigatory stop in this case: 1) Alesi's own experience as a policeman; 2) the exchange he observed between Magda and his companion; 3) the immediate parting as soon as the exchange was concluded; 4) the more rapid departure of Magda's companion upon apparently observing Alesi; and 5) the character of the area the policeman was patrolling. I shall examine each of these factors individually.

### Alesi's Experience

After reviewing the testimony bearing on Alesi's experience which was brought out at the suppression hearing, Judge Carter concluded that "Alesi was relatively inexperienced in the field of narcotics street transactions."[9]

This determination was a question of fact and it was properly within the province of

---

**6.** There is no reason to think that a stop of a pedestrian on the street is more acceptable than an automobile stop. *See, Terry v. Ohio, supra*, 392 U.S. at 9, 88 S.Ct. 1868.

**7.** 422 U.S. at 879, 95 S.Ct. at 2579, 45 L.Ed.2d at 615, 616.

**8.** *Cf.* Justice Douglas' concurrence in *Brignoni-Ponce*.

**9.** 409 F.Supp. at 739.

the trial court, unless the record reveals that its view of the facts was clearly erroneous. *Jackson v. Statler Foundation et al.*, 496 F.2d 623 (2d Cir. 1973), *cert. denied*, 420 U.S. 927, 95 S.Ct. 1124, 43 L.Ed.2d 397 (1975); *United States v. Bradshaw*, 169 U.S. App.D.C. 129, 515 F.2d 360 (1975) (citing Rule 52(a) Fed.R.Civ.P.); *United States v. Covello*, 410 F.2d 536 (2d Cir.), *cert. denied*, 396 U.S. 879, 90 S.Ct. 150, 24 L.Ed.2d 136 (1969); *United States v. D'Avanzo*, 443 F.2d 1224 (2d Cir.), *cert. denied*, 404 U.S. 850, 92 S.Ct. 86, 30 L.Ed.2d 89 (1971). There is substantial evidence on the record to support this finding of the trial judge.

Although he had been an officer for 11 years at the time of Magda's stop, Officer Alesi had spent the first three as a foot patrolman in Brooklyn. The next eight years were spent as a motorcycle policeman (App. 17),[10] and the record is silent as to Alesi's familiarity with drug transactions or arrests during this period. The claim of "expertise" is based solely on his six months experience as a foot patrolman in the Midtown South Precinct. In particular, Alesi testified that, during this six months period, he had witnessed two prior narcotics arrests in the area where Magda was stopped. Alesi had been on foot patrol for six months, but that time was not necessarily spent in the vicinity of Magda's arrest because the Midtown South Precinct covers an area of over one hundred city blocks (App. 11). Furthermore, we do not know if the narcotics arrests witnessed by Alesi resulted in narcotics convictions. Not only is the expertise evidence feather-light in this case, but the "expertise" factor has been strongly minimized in situations where there were a substantial number of prior related arrests. *United States v. Mallides*, 473 F.2d 859, 862 (9th Cir. 1973) (twenty prior arrests of aliens not sufficient basis on which to find "expertise" since the number of innocents arrested and number of convictions were unknown); *cf. United States v. Davis*, 147 U.S.App.D.C. 400, 458 F.2d 819, 821–22 (1972) (one officer with 12 months experience had been familiar with the neighborhood for about sixteen years; the other, with 6–8 months experience, had numerous occasions to observe drug-related incidents).[11]

It would be intolerable if police officers, whether in good faith or not, could justify an investigative stop on a personal predeliction or baseless whim. If "experience" is to be used to fill in the gaps in the officer's reasonable suspicion, this experience must be proved by a history of arrests and observations of arrests followed by convictions, and other activities which would mark this officer as an expert in dealing with such persons.

*The Exchange with Magda's Companion*

It is not disputed that Alesi saw what appeared to be an exchange of something between Magda and his companion.[12] Alesi estimated that he was thirty to thirty-five feet away at the time. He could not see what was exchanged (App. 12, 13). In fact, the exchange was susceptible to many interpretations. Officer Alesi did not notice any of the events which preceded his limited observations. He did not notice where the two had come from before they met, or how long they had been standing on the corner, or what they had been doing prior to the exchange. They could have been two friends exchanging addresses, or one stranger passing change of a quarter to another.

This is not a case where the officer saw that a "glassine bag" was exchanged, *People v. Quinones*, 33 N.Y.2d 811, 350 N.Y.S.2d 907, 305 N.E.2d 916 (1973), or where the officer saw a telltale paper bag being taken from a building known for its narcotics trade. *United States v. Santana*, 485 F.2d 365 (2d Cir. 1973), *cert. denied*, 415 U.S. 931, 94 S.Ct. 1444, 39 L.Ed.2d 490 (1974). Here the officer merely observed that "[t]hey

---

10. "App. ___" refers to the Appellant's record appendix and the transcript of the suppression hearing contained therein (unless otherwise noted).

11. The Government relies on *Davis* (GB 12). This reliance is not warranted since the case is clearly distinguishable.

12. 409 F.Supp. at 739.

just exchanged something" (App. 13) on a busy New York City street corner, in plain view of anyone who happened to glance their way, and with no attempt at concealment. This "exchange" was entirely innocuous and deserves no weight in determining whether there is that "reasonable suspicion" which would justify an investigative stop.

### The Immediate Parting After the Exchange and the More Rapid Departure of Magda's Companion

This factor is based upon the following portions of the hearing transcript:

| Epstein: (Asst. U. S. Atty.) | After the exchange was completed, what, if anything, did you see at that time? |
|---|---|
| Alesi: | Well, just as they were finishing up, the male black seen me, looked across the street and saw me just as he was finishing. He turned to his right and walked west on 43rd Street. (App. 13). |

* * * * *

| Court: | What was there about the nature of the transaction that you saw between Mr. Magda and the black man that sensitized you to ask him to stop? Because they were passing something? |
|---|---|
| Alesi: | At the location. And when the male black exchanged something and he seen me,[13] he turned in a rapid motion and proceeded westbound. . . (App. 44–45). |

The fact that Officer Alesi failed to mention the rapid turning when the subject first arose on direct examination sheds some doubt on the importance of the factor in his mind. More importantly, even if we accept Alesi's observation, a rapid turning motion has little or no probative value. Alesi did not testify that the "male black" ran

---

**13.** The Court sustained the defendant's objection to this characterization as conclusory. Alesi amended his response saying that "[h]e looked in my direction" (App. 14).

**14.** Cf. U. S. v. Christophe, 470 F.2d 865 (2d Cir. 1972), cert. denied sub nom., Pierro v. U. S., 411 U.S. 964, 93 S.Ct. 2162, 36 L.Ed.2d 684 (1973) (cited in the Government's Brief (GB 14) holding that when the defendant's car stopped and the defendant began to run away after a high speed auto chase in New York City, the

---

or shielded his face or acted other than a hurrying New Yorker on a Midtown street corner eager to reach his next destination. In fact, while his companion had turned and had begun walking away from Alesi, Magda walked across the street directly *towards* Alesi. If the male black's rapid motion had any relevance at all, it was certainly minimized by the concurrent behavior of Magda.

While we have nothing more than a rapid turn, even the obvious flight of a person must be regarded very carefully in deciding whether there are grounds for an arrest or a stop. Although flight has been a legitimate factor in a finding of probable cause, it has not been considered a "reliable indicator of guilt without other circumstances to make its import less ambiguous [citations omitted]." *United States v. Davis*, 147 U.S. App.D.C. 400, 458 F.2d 819, 822 (1972) citing *Hinton v. United States*, 137 U.S.App.D.C. 388, 424 F.2d 876, 879 (1969). *Accord, United States v. Hall*, 525 F.2d 857, 863 (D.C.Cir. 1976) (dissent).[14]

### The Character of the Area

When the testimony of Officer Alesi is finally distilled, it appears that he based his stop on the fact that two men exchanged something in a high crime area. It is enticing to place too much weight on the "high crime factor". I believe it should be accorded little weight in this instance.

The basic contention that this is a high crime area is itself open to challenge.[15] Alesi testified (App. 18) that there was a chart on the wall of his precinct house which noted that McCaffrey Park—located on the north side of 43rd Street approximately 100

---

attempted flight was one factor, among others, establishing probable cause to search the car).

**15.** Perhaps the proper question is whether this area is more subject to crime than other city neighborhoods; for surely the Government does not argue that, since New York City is more "crime prone" than others, there need be less of a showing to stop its citizens than to stop the citizens of, say, Chicago.

to 125 feet west of where the exchange occurred—was a "narcotics prone location." There is nothing to indicate how the chart was compiled, who compiled it, whether it was kept current, etc. Alesi did not see Magda or his companion come from the park before the exchange. The corner on which the exchange occurred was not, as far as we know, listed as a narcotics prone location.[16]

Alesi may, indeed, have had a "narcotics prone argument" if he had noticed the exchange <u>within</u> the park,[17] if he had made previous narcotics arrests there (or had witnessed them), and if these arrests had resulted in narcotics convictions.[18] But Alesi could satisfy none of these requirements. However, the Government presses this argument with respect to an exchange in the middle of a busy street corner in broad daylight. If correct, this argument would mean that anyone who happened to meet a friend on that corner during the day and exchange something would be more subject to a stop simply because of the high crime designation than if he had done the same thing, for example, on Wall Street or Park Avenue below 96th Street.

Even when it can be shown that criminal activity is more likely in one geographical area than another, courts are extremely hesitant to acknowledge this as a strong factor in satisfying the standards required for an interrogatory stop. *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) (investigative stop of three Mexican-looking men driving close to the Mexican border was not justified).[19] The fact that the area is notorious for criminal activity can only be considered when other less ambiguous facts are present which would lead one to suspect that criminal activity is afoot. *United States v. Nicholas*, 448 F.2d 622, 624 (8th Cir. 1971) (generalized knowledge of area crime is not enough; particularized knowledge of crime at place of stop required); *United States v. Davis*, 147 U.S.App.D.C. 400, 458 F.2d 819, 822 (1972); *People v. Oden*, 36 N.Y.2d 382, 385, 368 N.Y.S.2d 508, 329 N.E.2d 188 (1974).

The reason why the crime rate in a particular New York City area should be used with the utmost caution is straightforward: even in such an area very few of the thousands of people who live in or pass by the area are actually involved in crime. If a busy area in a major American city is crime prone, many persons are certainly not there by choice. New York State Court Judge Kleiman, who presided over a suppression hearing on the state marijuana charges against Magda, phrased the objection starkly:

> To deny the motion of the defendant in this particular case would mean that mere denomination of a particular area as a high narcotics area . . . would mean that an officer, upon the mere exchanging of hands, can stop anyone walking down 43rd Street and Eighth Avenue. I do not believe that is sufficient articulation for the basis of the right to stop a citizen. (State Transcript at 34, cited in 409 F.Supp. at 737).

The Government cites the Second Circuit's decision in *United States v. Salter*, 521 F.2d 1326 (2d Cir. 1975) as supporting its claim that the "reasonable suspicion" standard is quite lenient and that it was satisfied in this case. The facts in *Salter* are as follows: Two Border Patrol Agents

---

16. This court takes judicial notice of a fact of common knowledge among people living in Manhattan: approximately the same distance to the east is the New York Times office building.

17. *Cf. U. S. v. Salter*, 521 F.2d 1326 (2d Cir. 1975) where immigration officers had sufficient reason to question the defendant in connection with a violation of the immigration laws 2 miles from the Canadian border.

18. It may appear convincing that the transaction occurred 100 feet from the park, but the proximity becomes less compelling when we note that in New York City neighborhoods and the activities in them change, often dramatically, from block to block.

19. *U. S. v. Lara*, 517 F.2d 209 (5th Cir. 1975) (reasonable suspicion existed to search a heavily loaded truck in a sparsely populated area 1¾ miles from the Mexican border.)

in Buffalo, New York were just completing a routine immigration check of persons boarding a bus at the Greyhound Bus Terminal when they noticed Salter and his two women companions board the bus together. In response to a routine question, the women answered that they had been born in Buffalo, but with a thick "Jamaican" or "high English" accent. Salter was then questioned further and later convicted under the immigration laws for unlawfully encouraging the entry of aliens into the United States.

The Court points out explicitly that the *initial* questioning at the bus had not been raised on appeal.[20] The only question was whether the further interrogation of Salter was proper after the women had answered "boofalo" to the agents' query. The Court noted that experienced Border Patrol Agents could rely on their experience in assuming that few natives of Buffalo would have such a thick accent. Furthermore, Salter's silence in the face of the women's answers, and his close involvement in helping the women board the bus were "sufficient to raise a reasonable suspicion that he was a participant in violating the law."[21]

These clear and articulable facts relied on by Judge Friendly in *Salter* belie the Government's claim that Alesi had a reasonable suspicion sufficient to stop Magda. Magda's actions were, in themselves, wholly innocuous. He was on a busy New York City street corner, not near the Canadian border. He was exchanging something, not standing by while his companion apparently had just lied to a Border Patrol Agent.

Citing an earlier decision by Judge Friendly in *United States v. Santana,* 485 F.2d 365, 368 (2d Cir. 1973), *cert. denied,* 415 U.S. 931, 94 S.Ct. 1444, 39 L.Ed.2d 490 (1974), the Government notes that the reasonable suspicion test is a "rather lenient" one (GB 10). However, in *Santana,* this "rather lenient" test was only satisfied by the following factors: The officer saw two men enter a restaurant known to the police to be a meeting place for persons engaged in narcotics activities. The officer recognized the defendant as a major narcotics violator in New York City. He had also been informed anonymously that Santana was heavily engaged in narcotics activities. Santana was seen emerging with a brown paper bag[22] one half hour later, and after a short drive to a nearby apartment, he emerged after 10 minutes with a second bag. Again, the factors relied upon by Alesi pale in significance when we examine cases where the reasonable suspicion standard has been met.

The question in this case is not what the standard for a stop is at the Mexican or Canadian borders or when the police spot a known narcotics abuser, but rather what satisfies the "reasonable suspicion" required to stop one who is a stranger to the police officer on a busy New York City sidewalk. It is no answer to say that the intrusion was slight; that the officer merely tapped Magda on the shoulder and asked him a question or two. The record shows that Alesi followed Magda for approximately 8–10 feet after he had first tapped him and asked what he had been doing, and before they finally stopped (App. 31–35, 39–40). Magda would have been quite justified in believing that at that point he was not free to leave while being questioned by the officer.[23]

The intrusion is not necessarily minimal in this situation. When a pedestrian is stopped by a uniformed and armed peace officer, there is little question that the officer does not simply wish to chat. The person may feel threatened, compelled to answer the officer's questions, and may well believe that he is not free to remain silent

---

**20.** 521 F.2d at 1328.

**21.** Ibid.

**22.** The Court notes that "the brown paper bag . . . has long been a sort of hallmark of the narcotics business," 485 F.2d at 368.

**23.** Alesi did say that if Magda kept walking Alesi would not have arrested him. (App. 42–43).

or to leave. And in any case, baseless intrusions by the police are exactly what the Fourth Amendment prohibits. The basic premise of this clause is that—under no circumstances—is the state entitled to intrude into the personal lives of its citizens, unless it can make a clear showing that the intrusion is justified under applicable standards of reasonableness. Even a simple investigative stop must conform to these standards. *Terry v. Ohio, supra; United States v. Brignoni-Ponce, supra.*

The Government contends that a non-furtive exchange, followed by an immediate parting after which Magda walked towards the officer while his companion walked away from the officer—all occurring in broad daylight on a busy street corner in Midtown Manhattan—constitute the "reasonable suspicion" required for a stop. But after we eliminate the officer's "expertise" as a factor, we are left with two or three of the flimsiest straws of suspicion—which the Government attempts to plait into a stronger strand with the aid of the "crime prone" rationale. But the construction is unraveled, for the rationale is not weight worthy under these circumstances.

Two recently decided New York State cases support my position. While it is true that federal law governs the standards to be applied to the stop in this case, and that these federal standards may be less stringent than those of the state, I believe that the reasoning of these two cases is sound.

In *People v. Branch,* 387 N.Y.S.2d 581 (App.Div., First Dept. 1976) two Housing Authority detectives, who were investigating complaints of narcotics traffic in the area, saw the defendant receive a folded dollar bill from another on the grounds of a Manhattan housing project at 3:30 P.M. The police then "seized" the defendant, according to the court, by displaying their badges and shouting "police." The Court there held that evidence voluntarily turned over to the detectives at their request should be suppressed: "The mere observation at 3:30 in the afternoon of one person approaching another and handing such a person a folded bill without hearing any conversation or observing any conduct reasonably indicative of a violation of the law is not in and of itself sufficient to justify the seizure of the person or restraint of such person's liberty or freedom of movement. . . . The transaction observed here did not entail any 'telltale sign' of narcotics or other criminal activity . . ., nor did the mere exchange of currency constitute sufficient justification for the police action. . . . The action observed was as susceptible of innocent as of criminal activity, and the intrusion could hardly be termed minimal." 387 N.Y.S.2d at 583, 584 (citations omitted).

A similar result was reached where two officers saw the defendant remove a package from his sock, remove something from the package, and then replace the package—on 119th Street and Lexington Avenue in New York City at 3:00 P.M. The court held that, despite the fact that Harlem "was allegedly an area of high narcotic density," the evidence which resulted from the subsequent search should be suppressed.

"[T]he encounter in the instant case took place in mid-afternoon on a crowded street and not after midnight on an avenue devoid of pedestrian traffic. Moreover, defendant made no conspicuous attempt to avoid the officers. The only thing he was observed doing was removing an object from his sock. The officers admittedly did not see what was in the package, nor did they present any other evidence to support a founded suspicion that defendant was engaging in criminal activity.

"[The intrusion was not insubstantial since when] defendant was called over to the patrol car he was immediately surrounded and his liberty of movement significantly interrupted." *People v. Julian,* 387 N.Y.S.2d 435, 436, 437 (App.Div. First Dept. 1976).

A final issue warrants brief discussion. When Judge Carter rendered his opinion holding that the stop of Magda was illegal, the Government conceded that all the evidence which flowed from that stop should

be suppressed (App. 72).[24] After this Circuit had decided *United States v. Karathanos,* 531 F.2d 26 (2d Cir.), *cert. denied,* 428 U.S. 910, 96 S.Ct. 3221, 49 L.Ed.2d 1217 (1976), the Government sought to withdraw this concession and reargue the exclusionary aspect of Judge Carter's March 9, 1976 opinion. Arguments were heard, and in an opinion dated June 7, 1976 (App. 175–181), Judge Carter continued to hold that a thumbprint on a United Mutual Savings Bank deposit slip which matched Magda's print was not admissible, but he allowed the identification of Magda by the bank teller. The District Judge reasoned that the F.B.I. was able to link Magda's print to that on the deposit slip only after the discovery of the robbery note by Alesi indicated that Magda may have committed the robbery.[25] Thus, the District Court concluded correctly, that this evidence was the inadmissible fruit of the poisonous tree. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

The District Court, incorrectly, I think, reached a different conclusion with respect to the bank teller's identification. The court reasoned that the teller's ability to identify Magda was independent of Alesi's search and should be admitted. This conclusion would be correct if it were shown that the identification of Magda by the teller would have proceeded independently of the illegal search, *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920); *United States v. Paroutian,* 299 F.2d 486, 489 (2d Cir. 1962).

The Government has not even suggested this possibility.

Magda was discovered and was only available to be identified by the bank teller after the illegal stop and subsequent search uncovered evidence linking him to the United Mutual robbery. The Government does not suggest that it was actively looking for a person who matched the bank teller's description. It does not claim that the identification would have been inevitable (GB 18). *See United States v. Falley,* 489 F.2d 33, 40–41 (2d Cir. 1973); *United States v. Cole,* 463 F.2d 163, 173 (2d Cir.), *cert. denied,* 409 U.S. 942, 93 S.Ct. 238, 34 L.Ed.2d 193 (1972).

The identification evidence is not readily distinguishable from the thumb print found on the deposit slip.[26] I would decline to follow the Government's suggestion to limit the scope of the exclusionary rule by excluding only that evidence which is closely connected with the original illegal stop. I would, therefore, have excluded the identification testimony on the authority of *United States v. Ceccolini,* 542 F.2d 136 (2d Cir. 1976) and *United States v. Karathanos,* 531 F.2d 26 (2d Cir.), *cert. denied,* 428 U.S. 910, 96 S.Ct. 3221, 49 L.Ed.2d 1217 (1976).

**24.** The chain of evidence linking Magda to the robbery of the United Mutual Savings Bank in New York City is an investigative Rube Goldberg (GB 6–7 and affidavit of Jeremy Epstein, App. 167–172). After Alesi stopped and questioned Magda, Magda admitted that he had just purchased a marijuana cigarette; he was then placed under arrest, and a robbery note was discovered during the search pursuant to the arrest; Magda was later questioned by an F.B.I. agent who, coincidentally, had investigated the United Mutual robbery a few weeks earlier and who noticed the similarity in the handwriting between a note passed in that robbery and the one found on Magda; upon further questioning, Magda admitted committing that robbery. Further investigation matched Magda's thumb print with that left on a deposit slip at the time of the United Mutual robbery, and the teller victimized in the robbery was interviewed and provided a detailed description of the robber—which matched Magda's description.

**25.** The Government admits this. (GB 19.)

**26.** It is important to note, as the District Court did, that as a matter of course the deposit slip print would *not* have been compared with the millions of prints on file with the F.B.I. Although the F.B.I. did have Magda's prints on file at the time of the robbery, the deposit slip print was not identified until after Alesi's search.